**ROBINS KAPLAN LLP**
Roman M. Silberfeld (Cal. Bar # 62783)
David Martinez (Cal. Bar # 193183)
2049 Century Park East, Suite 3400
Los Angeles, California 90067-3208
T: (310) 552-0130
F: (310) 229-5800
rsilberfeld@robinskaplan.com
dmartinez@robinskaplan.com

Jeffrey S. Gleason (*pro hac vice* to be filed)
Jamie R. Kurtz (*pro hac vice* to be filed)
Nathaniel J. Moore (Cal. Bar # 277206)
Luke A. Hasskamp (Cal. Bar # 280872)
800 LaSalle Avenue
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
jkurtz@robinskaplan.com
nmoore@robinskaplan.com
lhasskamp@robinskaplan.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Blue Cross of California d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health Insurance Company; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross | Case No. 2:18-cv-04912 **COMPLAINT** **JURY TRIAL DEMANDED** |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

Blue Shield Healthcare Plan of
Georgia, Inc.; Blue Cross Blue Shield
of Wisconsin d/b/a Anthem Blue Cross
and Blue Shield; Community Insurance
Company d/b/a Anthem Blue Cross and
Blue Shield; Compcare Health Services
Insurance Corporation d/b/a Anthem
Blue Cross and Blue Shield; Empire
HealthChoice Assurance, Inc. d/b/a
Empire Blue Cross and Blue Shield;
Healthy Alliance Life Insurance
Company; HMO HealthKeepers, Inc.
d/b/a Anthem Blue Cross and Blue
Shield; HMO Missouri, Inc.;
RightCHOICE Managed Care, Inc.;
and Rocky Mountain Hospital and
Medical Service, Inc. d/b/a Anthem
Blue Cross and Blue Shield of
Colorado,

Plaintiffs,

v.

Sonoma West Medical Center, Inc.; DL
Investment Holdings LLC f/k/a Durall
Capital Holdings, LLC; Reliance
Laboratory Testing, Inc.; Medivance
Billing Service, Inc.; Aaron Durall; and
Neisha Carter Zaffuto,

Defendants.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

Plaintiffs Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; HMO Missouri, Inc.; RightCHOICE Managed Care, Inc.; and Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado; (collectively, "Plaintiffs" or "Anthem"), in their Complaint against Defendants Sonoma West Medical Center, Inc.; DL Investment Holdings LLC f/k/a Durall Capital Holdings, LLC; Reliance Laboratory Testing, Inc.; Medivance Billing Service, Inc.; and individuals Aaron Durall and Neisha Carter Zaffuto, (collectively, "Defendants") now bring this action to recover the millions of dollars Defendants stole through their fraudulent, deceptive, conspiratorial efforts and to have that conduct enjoined. Plaintiffs state and allege the following:

## **JURISDICTION AND VENUE:**

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question. Specifically, Plaintiffs have raised claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.

COMPLAINT

2.      This Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

4.      Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

5.      Defendants have submitted to personal jurisdiction of this Court because they have purposefully directed their fraudulent scheme and other activities at Anthem, Anthem members, and employees whose health plans Anthem administers who reside and are domiciled in this forum and because Anthem's claims arise out of Defendants' fraudulent schemes and other activities in this forum. By doing business in this forum and by knowingly directing their fraudulent scheme and conducting other activities towards Anthem and the BCBS Plans, Anthem and the BCBS Plans' members, and employers and employees whose health plans Anthem and the BCBS Plans administer who reside and are domiciled in this forum, Defendants have purposefully availed themselves of the privilege and opportunity of conducting business in California.

## NATURE OF THE ACTION

6.      In 2017, a personal injury lawyer from Florida approached a failing, 37-bed hospital in northern California with an idea he claimed could enrich them both virtually overnight. The lawyer, Aaron Durall, under the guise of a corporate shell, would acquire urine through a network of marketers and physicians from around the country; he would consolidate that urine through a toxicology lab in Florida that he owned; and the hospital would bill insurers for the testing even though other labs had been ordered to perform it. With that simple but deceptive

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

scheme, the hospital could increase the insurance payments for those services up to 100 fold.

7.    In the spring of 2017, the hospital – Sonoma West Medical Center, Inc. ("Sonoma West") – was failing. It was failing financially (having recently emerged from bankruptcy protection) and it was failing its patients (as the Centers for Medicare and Medicaid Services ("CMS") found in a report published just months later, Sonoma West was being grossly mismanaged and was unable to deliver reliable, quality care to its patients).

8.    Where the regulator saw a caregiver that could not give adequate care, Durall Capital Holdings, LLC ("Durall Capital") saw a potential gold mine. Sonoma West had something far more valuable to Durall Capital than patient care—status as a hospital that could generate reimbursement from insurers that would be orders of magnitude greater than Aaron Durall's laboratory, Reliance Laboratory Testing, Inc. ("Reliance Labs"), could.

9.    As Reliance Labs was aware from previous billing to Anthem, claims for urine toxicology tests submitted by an out-of-network lab were generally paid at around $32 for each test—the amount set forth in Anthem's professional fee schedule.

10.    But, if the co-conspirators could make it appear to Anthem that an out-of-network hospital was providing the services, for the hospital's patients, they could bypass the $32-reimbursement cap. With that simple deception, they could transform a $32 claim into a $3,500 claim, because hospitals were paid as a function of their billed charges.

11.    For this billing alchemy to work, Durall Capital needed to convince Sonoma West to mislead payors in several material ways: (1) by pretending that the thousands of laboratory services it would soon be billing were for the hospital's patients; (2) by representing that the hospital had been ordered to perform the testing; (3) by claiming billed charges in amounts that would be significantly

greater than the actual figures; (4) by concealing, in many instances, that another laboratory had actually performed the testing at issue; and (5) by concealing the fact that no effort would be made to hold patients accountable for their cost-sharing obligations.

12.     Sonoma West agreed to Durall Capital's proposed conspiracy in April 2017. According to the agreement, Sonoma West would allow Reliance Labs, Durall Capital, and Medivance to bill for testing of specimens intended for Reliance Labs using Sonoma West's provider credentials. For its part, Durall Capital committed to bolster the supply chain—soliciting urine from physicians who had never heard of Sonoma West and were oblivious to Durall Capital's intent to fraudulently increase the price of the services they ordered. And Medivance agreed to handle the billing to insurers—including Anthem and the BCBS Plans—to ensure the scheme would go undetected and that the co-conspirators could maximize their reimbursements.

13.     In the short time in which Defendants operated, their conspiracy netted them more than $16 million in payments from Anthem that they each knew they were not entitled to. These claims were for specimens obtained from patients who were not under the care of Sonoma West, and their physicians did not request that Sonoma West be involved in their care.

14.     The distance this urine had to travel as part of this scheme was remarkable. Approximately 90% of specimens originated in Orange County, California – nearly 500 miles from Sonoma West. The remaining 10% originated in states other than California.

15.     But that was just the beginning of their journey. After they were collected from patients, the urine samples did not go directly to Sonoma West, but instead travelled 2,300 miles east to Reliance Labs, in Sunrise, Florida. There the specimens were divided into two portions, with one remaining at Reliance Labs and the other boarding a plane to fly 2,600 miles back to Sebastopol where, purportedly,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    a basic screening test would be performed—one that Reliance Labs was more than

2    capable of conducting and, indeed, Reliance Labs was the entity who most

3    physicians had ordered to perform the testing.



14    16.    These nearly 5,000 miles were a trip not just around the country, but

15    the end-run on Anthem's professional fee schedule.

16    17.    But that is not where the fraudulent journey would end—because

17    Sonoma West's reimbursement was still capped by its billed charges. In the 18

18    months prior to the conspiracy, Sonoma West had billed such claims at an average

19    of $118 per test. After Defendants implemented the scheme, the charges for the

20    same service were reported as $3,500.

21    18.    The conspiracy was remarkably successful—delivering on Durall

22    Capital's promise of swift wealth. In the 18 months prior to the conspiracy, Sonoma

23    West submitted just 50 claims for urine toxicology testing to Anthem *in total*. In the

24    first nine months of the scheme, that number ballooned to more than 15,000 claims

25    – more than 50 claims *per day*.

26    19.    As the conspirators knew when they first implemented this scheme,

27    deception of insurers, including Anthem, was central to its success. Indeed, in

28    deciding whether to utilize Sonoma West for the scheme, Durall Capital closely

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

examined Sonoma West's relationships with insurers, including the anticipated reimbursement rates that Sonoma West would receive, to ensure that Durall Capital was partnering with a hospital that could extract substantial reimbursements from insurers.

20.    If Anthem had discovered that the tests were being performed by Reliance Labs, were being performed for members who were not Sonoma West patients, or were ordered by physicians with no affiliation with Sonoma West (and who had not ordered the tests from Sonoma West), they would not have been paid at the rates Anthem paid them. And if the co-conspirators had revealed that they did not collect patient-cost-sharing responsibilities from Anthem's members, Anthem would not have paid anything for the claims.

21.    Through this civil action, Anthem seeks compensation for the injuries that it has incurred because of Defendants' conduct, injunctive relief prohibiting Defendants from continuing to conduct this pass-through scheme, and other relief as set forth herein.

## **PARTIES**

22.    Plaintiff Blue Cross of California d/b/a Anthem Blue Cross of California is incorporated and headquartered in California.

23.    Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

24.    Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Connecticut.

25.    Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Maine.

26.    Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in New Hampshire.

27.    Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

28.     Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.

29.     Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.

30.     Plaintiff BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is incorporated and headquartered in Minnesota.

31.     Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

32.     Plaintiff Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Ohio.

33.     Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

34.     Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

35.     Plaintiff Healthy Alliance Life Insurance Company is incorporated and headquartered in Missouri.

36.     Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

37.     Plaintiff HMO Missouri, Inc. is incorporated and headquartered in Missouri.

38.     Plaintiff RightCHOICE Managed Care, Inc. is incorporated in Delaware and headquartered in Missouri.

39.     Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield, is incorporated and headquartered in Colorado.

40.     Defendant Sonoma West is a California non-profit public benefit corporation with its principal place of business in Sebastopol, California.

41.     Defendant DL Investment Holdings LLC f/k/a Durall Capital Holdings, LLC ("Durall Capital") is a Florida limited liability company with its principal place of business in Sunrise, Florida. According to filings with the Florida Secretary of State, Durall Capital's chief officer and manager is Aaron Durall.

42.     Defendant Reliance Labs is a Florida corporation with its principal place of business in Sunrise, Florida. According to filings with the Florida Secretary of State, Reliance Labs' chief officer and manager is again Aaron Durall.

43.     Defendant Medivance is a Florida corporation, created in June 2007. The company purports to be "a national leader in revenue cycle management and provider of healthcare business solutions" that caters to healthcare providers in the behavioral health, hospital, and toxicology businesses.

44.     Defendant Aaron Durall is a Florida resident and an officer and manager of Durall Capital and Reliance Labs.

45.     Defendant Neisha Carter Zaffuto is a Florida resident and president of Medivance.

## THE BCBS PLANS
### The BlueCard Program

46.     Plaintiffs are independent licensees (or subsidiaries of independent licensees) of the Blue Cross and Blue Shield Association ("BCBS Association").

47.     Each of the Plaintiffs is a participant in the BCBS Association's BlueCard program, which allows members of one licensee's health plans to obtain healthcare in another licensee's service area (*e.g.*, where a member is traveling or living outside of their home plan's service area).

48.     Because Sonoma West is located in Anthem's service area, services billed by Sonoma West for any BCBS Association licensee's members were billed to Anthem.

49.     Anthem then reconciled the cost of the services billed by Sonoma West with the BCBS Association licensee responsible for each member.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

50.   As a result, each of the Plaintiffs was harmed by the fraudulent scheme alleged herein.

### Assignment of Legal Claims for Money
### Owed by Other Licensees of the BCBS Association

51.   Other independent licensees of the BCBS Association (who similarly participate in the BlueCard program) have been injured by this pass-through scheme in the same way as Plaintiffs.

52.   Many of those licensees of the BCBS Association have assigned to Anthem their legal claims for money owed as a result of Defendants' pass-through scheme alleged herein.

53.   The assignments completed by these plans state, in pertinent part, that each plans "assigns and transfers to Anthem the rights, title and interest to legal claims for money owed, to the extent permitted by applicable law, that [the Plan] may assert against any individual or entity, known or unknown, because of their participation in the Sonoma West Pass-Through Scheme."

54.   Collectively, Plaintiffs and the assigning plans are referred to herein as the "BCBS Plans."

### The BCBS Plans' Fully Insured and Self-Funded Plans

55.   The BCBS Plans are insurers and third-party claims administrators for employer group health plans that provide benefits to their covered employees and dependents.

56.   The BCBS Plans insure plans directly (the "Fully-Insured Plans"). For these plans, the BCBS Plans resolve claims and makes benefit payments from their own assets.

57.   The BCBS Plans also provide administrative services to self-funded group health plans (the "Self-Funded Plans"). The BCBS Plans deliver these services pursuant to Administrative Services Agreements between The BCBS Plans and the health plan's sponsor (usually an employer), which identify the rights and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

obligations of each party. Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100, *et seq.*

58.    The BCBS Plans provide insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

59.    The BCBS Plans paid claims to Sonoma West on behalf of a number of Self-Funded Plans, and seeks redress in this lawsuit for those Self-Funded Plans.

60.    Anthem has prepared an exhibit listing the impacted Self-Funded Plans and will seek the Court's leave to file the document once a protective order is in effect, given the confidential and sensitive nature of such a document listing many of BCBS Plans' customers.

61.    Anthem and the BCBS Plans' agreements with their customers expressly give Anthem and the BCBS Plans authority and discretion to recover overpayments on behalf of their customers.

62.    Accordingly, Anthem has authority to seek recovery on behalf of the impacted Self-Funded Plans and for payments made by the Fully Insured Plans.

## **FACTUAL BACKGROUND**

### **Urine Drug Testing**

63.    Drug tests are laboratory analyses used to aid in the detection of prescription, recreational, or illicit substances in human specimens. Drug testing may be used to meet state requirements, evaluate therapeutic compliance and drug aberrant behavior (*e.g.*, abuse or diversion), or to evaluate for child and elder abuse. It can include analysis for most drugs, chemicals, and/or plant products that are known to be misused, including for recreational use.

64.    Although drug tests may be performed on a variety of specimen types, urine drug testing is used most commonly because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

COMPLAINT

65.     Urine drug testing typically falls into two categories of testing: screening and confirmation.

66.     Screening testing is used to determine the presence or absence of one or more drugs or drug classes. It is typically performed via immunoassay (*i.e.*, a biochemical test that measures the presence or concentration of a macromolecule or a small molecule in a solution using an antibody or antigen). Results are expressed as negative, positive, or numeric. Screening testing is also referred to as "initial", "presumptive", or "qualitative" testing.

67.     Confirmation testing is a follow-up test performed on a separate portion of the original specimen to validate the identity and quantity of a specific drug or metabolite. Confirmation testing is typically performed using either gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and results are expressed as a concentration of a particular metabolite or analyte (*e.g.*, nanograms per milliliter (ng/mL)). Confirmation testing is also referred to as "definitive" or "quantitative" testing.

### The Impetus for the Pass-Through Scheme

68.     In early 2017, Sonoma West was in extremely poor financial condition. Just three years before, in 2014, the hospital – then called Palm Drive Hospital – had closed and filed for bankruptcy.

69.     The hospital reopened in 2015 under its current name – Sonoma West – but has consistently faced dire financial circumstances, generated little revenue and faced mounting debts. In February 2017, Sonoma West had outstanding debts of more than $6.8 million.

70.     As a result, when the entity managing the hospital ended its contract in March 2017, the Palm Drive Health Care District, which owns Sonoma West, contacted multiple companies about taking over management or ownership of the hospital. The efforts to find an owner or new manager for the hospital were initially unsuccessful.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

71.     By the spring of 2017, the hospital's inpatient population had dropped to just two individuals.

72.     Sonoma West's failures were memorialized in a report issued by CMS in September 2017 that found the hospital's governing board failed to provide adequate oversight on management, operations, and financials, which—the agency concluded—placed Sonoma West in a position of being unable to "ensure the provision of quality health care and services in a safe environment."[1]

73.     A safety risk in the eyes of a regulator was a massive opportunity in the eyes of Durall Capital and Reliance Labs. To them, Sonoma West was not a caregiver; it was a hospital that could be used to pass through laboratory testing and mark up every urine test order by hundreds, if not thousands, of dollars. With projections of thousands of these tests being billed every month, the potential profits were too good to resist.

**Sonoma West's Agreements with Durall Capital and Other Defendants**

74.     Formalizing the conspiracy, Sonoma West entered into a series of agreements with Durall Capital in or around April 2017.

75.     The agreements included a Laboratory Management Services Agreement, a Hospital Management Services Agreement, a Laboratory Service Agreement for Confirmation Testing, a Consulting Agreement, and a Business Associate Agreement. True and correct copies of several of those agreements are attached as Exhibit A.

76.     However, the full extent of the relationship between Sonoma West and other Defendants is unknown because some of the agreements have not been made public. As one member of the Palm Drive Health District's Board of Directors has admitted, there were "unwritten verbal agreements" with Aaron Durall—ones that

---

[1] http://palmdrivehealthcaredistrict.org/wp-content/uploads/2016/12/PDHCD-SWMC-GovBody-Dec4-2017-Agenda-2of2.pdf (last visited May 22, 2018).

COMPLAINT

the defendants continue to keep secret.[2]

77.     Even without the benefit of the "verbal agreements," the roles that each of the defendants played in the conspiracy are captured in black and white. As laid out in the Laboratory Management Services Agreement, Durall Capital would be responsible for obtaining urine from drug rehab patients and routing it to Sonoma West—using lab equipment that Durall Capital would buy and install. Additionally, all of this new testing would be managed exclusively by Durall Capital and its personnel—not the hospital.

78.     The agreement further provided that Durall Capital would bill insurers for these services using Sonoma West's credentials. And, to ensure that insurers did not detect Reliance Labs' involvement, Defendants agreed that all reimbursement would be made to Sonoma West.

79.     The conspirators entered a separate Laboratory Service Agreement for Confirmation Testing in furtherance of the conspiracy, as well. According to those terms, Durall Capital would perform confirmation testing on the specimens after the screening tests were complete.

80.     While the written contract indicates that Sonoma West was to send the sample to Durall Capital for confirmation testing after the screening test was performed, in practice, all urine specimens were first consolidated by Reliance Labs. Reliance Labs would then split the sample, retaining a portion to conduct confirmatory testing and routing the remainder through Defendants' network of pass-through hospitals—of which Sonoma West was one of many options—for screening testing.

81.     Defendants would pick-and-choose which hospital to use for testing and billing the services. Geography appeared to be a driving factor in determining

_____

[2] http://www.northbaybusinessjournal.com/northbay/sonomacounty/8166723-181/sonoma-west-medical-center-cbs-news (last visited May 22, 2018).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

where the specimen would end up—with most of the urine obtained in California being run through Sonoma West.

82. All confirmation testing, according to the contract, would be billed using Sonoma West's billing credentials.

83. Put another way, the parties agreed that Sonoma West would bill for testing that Reliance Labs performed—a fact that was concealed from Anthem as part of the scheme.

### The Shuttling of Urine Specimens across the Country

84. With its agreements with Sonoma West in hand, Durall Capital needed to acquire as much urine as possible. To do so, upon information and belief, Durall Capital and Reliance Labs turned to a network of marketers and referring providers who would supply the specimens for testing. Detox and rehab facilities in Orange County were an attractive target and, it appears, became the primary focus for urine solicitation.

85. Upon information and belief, in marketing to physicians and detox clinics, the marketing teams represented that the testing would be performed by Reliance Labs. The marketers concealed from the clinicians that the urine would actually be routed to an out-of-network 37-bed hospital by way of a 5,000 mile odyssey.

86. Upon information and belief, the marketers further hid from the ordering clinicians that by diverting the billing and testing to that hospital, the conspirators would be transforming a $32 test into as much as a $3,500 obligation to the patient and his or her insurer.

87. When the ordering physicians were provided with the test results, they received the results from Reliance Labs, on Reliance Labs letterhead—with no mention of Sonoma West having any involvement in the care.

### Billing for Urine Toxicology Testing

88. As part of the conspiracy, Durall Capital took on the responsibility for

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

billing insurers for the testing, though this role was soon given to Medivance, under the direction of Neisha Carter Zaffuto.

89.     In furtherance of the conspiracy, Medivance took numerous steps to mislead Anthem about the services for which claims were being submitted.

90.     *First*, Defendants misrepresented who had been ordered to perform the testing at issue. In submitting claims for reimbursement to Anthem under Sonoma West's facility and billing information, Defendants represented that the ordering physicians had ordered this testing from Sonoma West when, in reality, other labs had been ordered to perform the testing and the ordering physicians had no idea that Sonoma West was involved in providing services for their patients.

91.     *Second*, the claims submitted by Defendants included multiple misrepresentations that suggested that the member at issue was a Sonoma West patient who had been seen at the Sonoma West facility and was under the treatment of a Sonoma West physician. This was used to justify the excessive reimbursement that Defendants sought from Anthem when, in reality, Sonoma West was, at most, acting as a reference lab. It also served to further conceal the existence of the pass-through scheme and the identities of the co-conspirators. These misrepresentations included: (i) bill type "131" in some instances, which indicated a patient status of outpatient; (ii) admission type; (iii) source of admission; (iv) discharge status; (v) attending physician; and (vi) diagnosis code. All of this information misrepresented the claim as if having been for a patient seen at the hospital and having been under the care of hospital personnel.

92.     *Third*, the claims at issue concealed the identities and involvement of the co-conspirators in the pass-through scheme, including, in some instances, the fact that another entity was performing the testing that was being billed by Sonoma West. For example, the Sonoma West claims never utilized modifier "90" or other information to indicate the involvement of reference or referring labs. Nor did the claims provide the NPI or other identifying information for Reliance Labs, which

was involved in much of the testing and in all of the collection of urine specimens.

93.     *Fourth*, Defendants misrepresented the billed charge amount when they billed $3500 for each claim submitted. By claiming $3500, Defendants: (i) inflated the actual amount by at least 20 times; (ii) failed to reflect the amounts paid to Reliance Labs for the testing that it performed; and (iii) failed to reflect that, upon information and belief, Defendants were systematically waiving and/or making no meaningful effort to collect the significant cost-sharing obligations that Anthem and the BCBS Plans' members owed.

94.     Anthem reasonably relied on these material misrepresentations and omissions in making payment on the claims at issue.

**Reimbursements Paid by Anthem**

95.     When claims for toxicology services are submitted to Anthem by out-of-network laboratories, they are paid according to Anthem's professional lab fee schedule. For service code 80307 – the code for screening toxicology tests primarily utilized by Defendants – Anthem's professional lab fee schedule pays approximately $32 per test.

96.     However, the same fee schedule does not apply to claims submitted by facilities, such as hospitals. Hospitals often receive greater reimbursement because they typically have greater overhead and provide a wider variety of services than a professional laboratory. For Anthem, member benefits plans determine the amount paid for hospital claims.

97.     Additionally, when a provider is out-of-network, member benefits are defined in their explanation of coverage, which outlines what percentage will be paid for out-of-network facilities, based on the total charge indicated on the UB-04 or equivalent form. Thus, when Sonoma West billed $3500 as a hospital, Anthem paid a percentage of the charges in line with the member's benefits plan, and the member was responsible for any remainder.

98.     Had Sonoma West submitted these claims on a CMS 1500 form,

1   which are appropriate for lab services, or disclosed that the claims were for referred

2   testing, it would have received approximately $32 per claim, in line with Anthem's

3   professional lab fee schedule.

4       99.   Sonoma West's claims made no mention of Reliance Labs, which, as

5   Defendants knew, would indicate that there was no referring or reference lab

6   involved in the testing at issue. This, of course, was a material omission, and one

7   that was necessary to prevent Anthem from discovering the pass-through scheme.

8   In fact, Anthem had placed Reliance Labs on a prepayment review beginning in

9   April 2017 due to a high volume of questionable claims, which meant that most

10  claims being submitted directly by Reliance Labs were being denied by Anthem.

11      100.   As the conspirators agreed at the outset, Sonoma West cut Durall

12  Capital and Reliance Labs in on the proceeds of the scheme—paying the two

13  entities millions of dollars for their role in defrauding Anthem. Sonoma West

14  retained approximately one-third of the payments received from insurers, while the

15  remaining two-thirds was distributed to the other Defendants at the direction of

16  Durall Capital.

17  **Defendants Take Additional Steps to Conceal Their Fraud from Anthem**

18      101.   On October 30, 2017, Anthem received a complaint from a member in

19  Saint Louis, Missouri. She had received a statement for toxicology services

20  purportedly performed at Sonoma West. This had to be a mistake, she explained—

21  she had never been to California and had not received the services the statement

22  claimed were provided by Sonoma West.

23      102.   Anthem contacted Sonoma West to confirm whether it had cared for

24  this patient. Hospital staff stated that the member was not one of its patients, as

25  there was no record of that individual in its system.

26      103.   In light of this revelation, Anthem's Special Investigations Unit—

27  which handles investigations of fraud, waste, and abuse—sent a medical-records

28  request to Sonoma West seeking records related to a random sample of 50 urine

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

- 17 -

toxicology claims for which Anthem had previously reimbursed the hospital.

104.   In its letter, Anthem asked that Sonoma West identify any third party laboratories involved in the claim.

105.   On November 16, 2017, Anthem received a call from someone identifying herself as Preet Kaur, a Release of Information Specialist at Sonoma West. Ms. Kaur reported that she "could not locate a single patient" from the audit request in any of the Sonoma West files. Ms. Kaur further noted that the account numbers provided on the claims forms did not match Sonoma West patient account numbers.

106.   Later that day, Anthem received a call from Angela Mills, a Health Information Management Director at Sonoma West, who confirmed that the patients had not been seen at the hospital and "were not patients" of Sonoma West.

107.   On November 21, 2017, a woman introducing herself as "Neisha" placed a call to Anthem. She claimed to be a "Release Information Specialist with Sonoma West" in the Health Information Department. Neisha claimed to be responsible for medical records at the hospital and told Anthem that she was able to locate the members requested in the audit letter. She requested an additional ten days to provide the documents requested, which Anthem granted.

108.   On November 29, 2017, an Anthem investigator called Sonoma West, asking to speak with Neisha. He was directed to a health information clerk, who confirmed that there were five employees in the records department, none of whom was named Neisha.

109.   Later that day, Ms. Mills called Anthem to report that Neisha did work at Sonoma West, but in a different department.

110.   Upon information and belief, Neisha was not a Sonoma West employee, but rather Neisha Carter Zaffuto, President of Medivance, who was represented to be a Sonoma West employee in order to conceal the identities and involvement of other Defendants.

**Medical Records for 50 Members Received from "Sonoma West"**

111.   On December 6, 2017, Anthem received medical records related to some of the patients in the sample.

112.   In its request for records, Anthem had asked for the documentation that any toxicology lab would be expected to have for claims that it billed: laboratory records, urine drug test results, order forms, laboratory referral documentation, requisition order forms, procedure reports, and other documentation regarding services performed. Anthem further requested information regarding whether any third-party laboratory was involved in any of the claims.

113.   The documents Anthem received did not come close to what would be expected from an entity that had provided the services billed. And they appeared designed to further conceal the conspiratorial conduct. An exemplary redacted copy is attached as Exhibit B.

114.   To this day, Sonoma West has been unable to provide Anthem a single requisition form indicating that the testing had actually been ordered by a physician – let alone that Sonoma West had been the entity from whom the testing had been ordered.

115.   None of the lab documentation provided was signed by the lab technician who purportedly performed the testing. This presents not only a quality of care issue, but also serves to conceal where the testing was actually performed.

116.   The section of the documentation that should have indicated the draw locations – *i.e.*, where the specimen was provided by the patient – was left blank, obscuring the fact that they had been drawn hundreds, if not thousands, of miles away.

117.   Despite Anthem's explicit request that it identify any third-party labs involved in the testing, Sonoma West did not acknowledge or indicate any such labs were involved, much less that many of the services were provided 2,600 miles away at Reliance Labs – the lab that had actually been ordered to perform the

COMPLAINT

1   testing.

2   118.   Moreover, at least some of the test results produced were different

3   from what was provided to ordering physicians—*i.e.*, the results that bore Reliance

4   Labs letterhead when provided to the physicians, were now cloaked in Sonoma

5   West letterhead—indicating that they had been altered before being produced to

6   Anthem.

7   **Ordering Physicians Confirmed That**

8   **They Had Not Approved Sonoma West As The Testing Lab**

9   119.   Anthem's Special Investigations Unit has interviewed some of the

10   physicians who purportedly ordered the tests at issue. Those interviews confirm that

11   the co-conspirators deceived not just Anthem, but the treating physicians and their

12   patients, as well.

13   120.   Physicians stated that they never ordered testing from Sonoma West,

14   nor did they receive test results from Sonoma West. In fact, the physicians stated

15   that the tests results they had received were from different laboratories, primarily

16   Reliance Labs.

17   121.   The physicians also confirmed that they were not credentialed at

18   Sonoma West, nor had they ever been employed by Sonoma West. In fact, of the

19   physicians interviewed, only one had ever even heard of Sonoma West.

20   122.   When asked, the physicians could think of no legitimate reason why

21   Sonoma West would be involved in testing their patients' specimen.

22   **Sample Claim**

23   123.   The following sample claim is representative of the claims at issue in

24   this matter.

25   124.   Pasted below is a copy of a claim form for toxicology services that

26   Sonoma West submitted to Anthem (with patient identifying information has been

27   redacted).

28   125.   Anthem paid Sonoma West $2,100 for the services billed.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS



126.   The claim form includes several material misrepresentations.

127.   First, the initial box in the upper left corner identifies Sonoma West Medical Center as the provider who performed the testing, and lists its address as the location where the services were rendered.

128.   Box 76 in the lower right identifies as the "attending physician" a doctor who was not an attending physician at Sonoma West. The physicians listed confirmed in an interview that she had no relationship whatsoever with Sonoma West and was certainly not an attending physician at that facility.

129.   She further confirmed that she did not have the specimen sent to Sonoma West, nor did she intend that it be tested there.

130. Sonoma West billed Anthem using CPT code 80307 (screening testing, any number of drug classes) and revenue code 0300 (general laboratory) for a total of $3,500, which represents the hospital's billed charges. Modifier 90 was not included with this claim, nor were the identities of any reference or referring labs included.

131. In support of this claim, Sonoma West provided a copy of the test results to Anthem:



132. The results are printed on Sonoma West letterhead, as if Sonoma West had been ordered to do the testing and had, in fact, ordered and performed the testing for its patients.

133. An Anthem investigator showed this record to the physician who purportedly ordered the test at issue. The physician confirmed that she had never been provided these results—nor had she ever seen lab results that indicated Sonoma West had performed testing for one of her patients. The physician was certain that her provider information had been used without her knowledge or permission.

134. Also among the records provided to Anthem in support of this claim was a document on the letterhead of Reliance Labs:

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS



135.   The form includes a space for the patient to "consent and agree" to provide his urine specimen "to the facility designated by [his] doctor as described above." The form also includes a space for the physicians to sign to authorize the testing. It contains neither patient nor physician signature.

136.   The form indicates that the physician ordered three distinct tests—but Sonoma West was unable to produce an order for any of those services. One of those tests was "SWMC-SO," which, upon information and belief, stands for Sonoma West Medical Center – Standing Order. The physicians identified as having ordered these tests confirmed to the Anthem investigator that she had not ordered such testing from Sonoma West and that she did not have any standing

order for Sonoma West.

137.   In addition, the form represents that the ordering physician worked at Integritox Laboratory. In her interview, that physician confirmed that she not only did not work at that lab, she had never heard of it.

138.   As a result, in reliance on the misrepresentations contained on the UB-04 equivalent claim form and material information that further served to mask the pass-through scheme, Anthem paid Sonoma West $2,100, 60% of the claim.

139.   The remaining $1,400 was supposed to be paid by the Anthem member, who owed 40% of the service charge as coinsurance, but, upon information and belief, Defendants waived and/or made no effort to collect that amount from the member.

140.   Had a standard out-of-network reference lab billed for these services, it would have been paid approximately $32 for the claim, in line with Anthem's lab fee schedule. Had Reliance Labs billed directly for the claim, it likely would have been denied outright due to the prepayment review instituted by Anthem.

### Failure to Collect Anthem Members' Cost-Sharing Obligations

141.   As part of their benefits plans with Anthem and the BCBS Plans, members owe cost-sharing responsibilities (*e.g.*, copayments, coinsurance, and/or deductibles) by making payments to providers.

142.   The amount of these responsibilities varies depending on a number of factors, including the services provided and whether the provider is in- or out-of-network. The responsibilities are typically much higher for services provided by out-of-network providers.

143.   Anthem interviewed certain members who had toxicology lab services that were billed to Anthem.

144.   The members interviewed stated that they had never been to Sonoma West and, indeed, had never heard of it. None of the members stated that they had ever received a bill for copayment, coinsurance, or deductibles from Sonoma West.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

145.   For example, one member interviewed owed $8,000 in co-insurance responsibility and about $1,900 in deductible responsibly. Yet, the member could not recall ever receiving a bill for either co-insurance or a deductible from Sonoma West. The member was sure that she would have remembered a bill for $8,000.

146.   Other members had similarly high cost-sharing obligations.

147.   Upon information and belief, Defendants systematically waived and/or made no effort to collect these cost-sharing obligations in an attempt to further conceal the pass-through scheme because if members received significant bills from a small hospital in northern California that they had never been to or even heard of, they likely would have complained to Anthem and the BCBS Plans, which would have brought this scheme to light.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

## Defendants' Attempts to Circumvent Anthem's
## Efforts to Detect and Eliminate Improper Billing

148.   In light of the improper and fraudulent billing by Sonoma West, beginning in January 2018, Anthem instituted a "zero-pay" system edit into its claims software to pay zero dollars for urine toxicology claims submitted by Sonoma West.

149.   Specifically, the edit flagged claims with bill type 141, revenue code 0300, and CPT code 80307.

150.   Yet, Defendants' billing patterns have evolved – using different, and inaccurate, coding for the same services – which has made it even more difficult for Anthem to detect improper claims.

151.   For example, Defendants have submitted hundreds of claims with the bill type of 131, which is intended for "outpatients" who have been admitted to and discharged from an outpatient department at Sonoma West. Of course, the services were not being provided to Sonoma West outpatients so this, too, was a lie—but it enabled these improper claims to further evade Anthem's efforts to detect them. In fact, some of the patients who were now being billed as "131" had initially been

billed as "141", further demonstrating the impropriety of the "131" bill type.

152.   Defendants also used a variety of revenue codes (306, 309, 920, and 929) and CPT codes (87633, 87486, 87507, 87798, 87581), none of which is appropriate for urine toxicology testing, but which made it more difficult to detect improper claims.

153.   In some cases, Defendants simply used revenue code of 500, which is intended for "Outpatient Services – General Classification." The revenue code does not indicate that any toxicology lab services have been provided.

154.   Defendants also began submitting claims without including any CPT code at all, which made it very difficult for Anthem to detect.

155.   In February 2018, Anthem approached Sonoma West and the District with its concerns regarding this improper billing.

156.   According to public statements made by or on behalf of the entities, after conducting an investigation into the merits of Anthem's concerns, Sonoma West purportedly shut down the hospital's toxicology program at the end of February 2018.

## COUNT I

## FRAUD & FRAUDULENT CONCEALMENT

157.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

158.   As alleged herein, Defendants made, or caused to be made, intentional misrepresentations of material facts relating to the insurance claims submitted to Anthem for reimbursement, with the intent to induce Anthem and the BCBS Plans to rely on those misrepresentations and pay those insurance claims.

159.   Each Defendant knowingly participated in the fraud by agreeing to submit or cause to be submitted the claims to Anthem as if they were appropriate for reimbursement.

160.   Each Defendant's participation in the fraudulent scheme includes, but

is not limited to, the following:

a.   Durall Capital: Durall Capital took over management of the Sonoma West hospital in order to gain access to Sonoma West's relationships and favorable reimbursement rates with insurers, including Anthem, which was essential to the success of the scheme. Durall Capital engaged the other Defendants, including Medivance, Reliance Labs, and Neisha Carter Zaffuto, to perform functions essential to the success of the scheme, and to use Sonoma West's facility and billing information to submit claims to Anthem. Durall Capital used the on-site laboratory that it installed at the Sonoma West facility as a front for the fraudulent scheme, and took steps to undermine Anthem's efforts to identify and stop the scheme. Durall Capital also helped procure the thousands of urine specimens that were consolidated by Reliance Labs and ultimately tested as part of this scheme. Durall Capital conspired with the other Defendants to submit the claims at issue to Anthem while knowing that the claims contained material misrepresentations and omissions. In addition, when payment was made by Anthem to Sonoma West, Durall Capital controlled the distribution of those funds and shared such payment with the other Defendants, in exchange for their participation in the fraudulent scheme.

b.   Reliance Labs: Reliance Labs conducted some of the testing at issue, in spite of the fact that it conspired with the other Defendants to submit the corresponding claims to Anthem as if the testing were performed at and by Sonoma West. In addition, when test results were submitted to the physicians who had ordered the testing, Reliance Labs was the party to submit the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   test results to those physicians on its letterhead, regardless if the

2   testing was performed by it or Sonoma West. Reliance Labs also

3   facilitated the collection of urine specimens from physicians

4   around the country and the re-distribution of those specimens

5   Defendants' network of hospitals throughout the country for

6   testing and/or billing. This was essential after Anthem instituted

7   its prepayment review of claims submitted by Reliance Labs

8   beginning in April 2017.

9   c.   Aaron Durall: Aaron Durall was responsible for the

10   management of the scheme, including the management and

11   control of the Sonoma West facility, including the new

12   toxicology laboratory that he helped to install. Aaron Durall was

13   primarily responsible for Defendants' conspiracy to commit this

14   fraudulent scheme, causing Sonoma West's agreement with

15   Durall Capital and other Defendants, and engaging Reliance

16   Labs, Medivance, and Neisha Carter Zaffuto to participate as

17   well. Aaron Durall created Durall Capital and, upon information

18   and belief, arranged for its management agreement with Sonoma

19   West specifically to carry out this fraudulent scheme. Further,

20   upon information and belief, Aaron Durall has personally

21   received a substantial portion of the amount paid by Anthem and

22   the BCBS Plans as a result of this fraudulent scheme.

23   d.   Medivance: Medivance agreed with Sonoma West, Durall

24   Capital, Reliance Labs, Aaron Durall, and Neisha Carter Zaffuto

25   to prepare and submit claims to Anthem on behalf of Sonoma

26   West, in spite of the fact that it knew the claims contained

27   numerous material misrepresentations and omissions.

28   Medivance worked closely with Durall Capital and Aaron

1    Durall to manage numerous functions of Sonoma West remotely
2    from Florida (including billing and contracting with payors), in
3    order to prevent on-site employees at Sonoma West and
4    insurers, including the BCBS Plans, from identifying this
5    fraudulent scheme. When Anthem began investigating the
6    propriety of the claims being submitted from "Sonoma West,"
7    Medivance took steps to conceal the identities of the other
8    Defendants from Anthem and the existence of the scheme by
9    responding to Anthem's request for information as if it was
10   Sonoma West including, upon information and belief, test
11   results from Reliance Labs that were copied onto Sonoma West
12   letterhead.

13   e.   Sonoma West: Sonoma West agreed to allow Durall Capital and
14        Aaron Durall to take over management of the hospital and to
15        establish the toxicology lab at issue. Sonoma West also agreed
16        to have Medivance handle the billing of claims to insurers and to
17        have Reliance Labs perform at least some of the testing at issue.
18        Additionally, Sonoma West conducted lab testing that no
19        physician had ordered from it, nor was the testing it performed
20        for any of its patients. Further, Sonoma West took steps to
21        conceal the identities and involvement of the other Defendants
22        from Anthem, including, upon information and belief,
23        representing to Anthem that Neisha Carter Zaffuto was an
24        employee of Sonoma West and providing purported test results
25        on Sonoma West letterhead that had never been provided to the
26        ordering physicians. In exchange for its efforts, Sonoma West
27        received approximately one-third of the funds extracted from
28        Anthem and the BCBS Plans.

- 29 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

f.   <u>Neisha Carter Zaffuto</u>: As President of Medivance, Neisha Carter Zaffuto was responsible for Medivance's agreement to submit claims at issue to Anthem on behalf of Sonoma West, in spite of the fact that she knew the claims were not payable by Anthem and were fraudulent. After agreeing to participate in the scheme, Neisha Carter Zaffuto oversaw and directed Medivance's submission of fraudulent claims to Anthem on behalf of Sonoma West, and caused Medivance to take the actions described above. Upon information and belief, Neisha Carter Zaffuto was also involved corresponding with Anthem SIU in response to its requests for information in a manner that concealed the fact that other Defendants were involved in the testing and billing of the claims at issue, including procuring test results from Reliance Labs to copy onto Sonoma West letterhead.

161.   Specifically, Defendants caused insurance claims to be submitted to Anthem. Many of those claims misrepresented, at the least:

a.   the rendering provider of the testing (which each claim said was Sonoma West);

b.   the rendering provider's specialty code and description (which each claim said was a hospital);

c.   the rendering provider's NPI (for which each claim provided Sonoma West's NPI);

d.   the rendering provider's tax identification number (for which each claim provided Sonoma West's tax identification number);

e.   the rendering provider's address (for which each claim provided Sonoma West's address);

f.   admission type (often misrepresented as "2," which indicates an

- 30 -

1    urgent admission, when there was no admission);

2    g.    source of admission (often misrepresented as "9," which

3          indicates information not available, when there was no

4          admission);

5    h.    discharge status (often misrepresented as "01," which indicates a

6          discharge to home or self care when there was no admission

7          and, thus, no discharge);

8    i.    the attending physician (for which each claim provided the name

9          and NPI of the healthcare provider that referred the testing

10         originally);

11   j.    the patients' status (which in some instances represented the

12         patient as having been an "outpatient" even though the patient

13         had never been to Sonoma West);

14   k.    the CPT code (which failed to include modifier 90, used to

15         identify referred claims);

16   l.    the total charge (representing $3,500 as the charge without

17         regard to the appropriate billing amount set forth in Anthem's

18         fee schedule and without disclosing that cost-sharing obligations

19         were routinely waived and without disclosing the amounts paid

20         to Reliance Labs for the testing that it performed); and

21   m.    that the billing information as shown on the face of each UB-04

22         equivalent claim form submitted to Anthem was "true, accurate

23         and complete."

24        162.   By submitting the claims on UB-04 electronic equivalent forms,

25   Defendants also falsely certified that it "did not knowingly or recklessly disregard

26   or misrepresent or conceal material facts."

27        163.   The claims also failed to disclose to Anthem and the BCBS Plans

28   material facts relating to the insurance claims for laboratory testing that Sonoma

- 31 -

West and/or each Defendant submitted, or caused to be submitted, to Anthem, including but not limited to that Sonoma West was participating in a pass-through scheme designed to misuse the relationship between Sonoma West and Anthem and conceal the fact that (i) Reliance Labs – not Sonoma West – was performing at least some of the testing; (ii) physicians were ordering the urine drug testing be performed by other labs, such as Reliance Labs, and not Sonoma West; and (iii) that the Anthem members being tested were not patients of Sonoma West nor had never visited Sonoma West.

164.   Nearly every urine drug testing claim submitted in Sonoma West's name from at least June 2017 to the present was fraudulent.

165.   Further, Sonoma West, Medivance, and other Defendants have taken additional steps, including using different and improper billing codes to further misrepresent the testing being performed and to circumvent Anthem's efforts to stop this fraud.

166.   Additionally, upon information and belief, in response to requests from Anthem, Defendants provided test results of Sonoma West letterhead that had never been provided to the ordering physicians to further conceal that Reliance Labs and other Defendants were involved in the testing and billing of the claims submitted.

167.   During the course of this scheme, Defendants submitted more than 15,000 fraudulent claims to Anthem, causing Anthem to pay on behalf of itself and the BCBS Plans more than $16 million to Defendants.

168.   Even if Sonoma West performed some of the testing on site, it failed to disclose the identity of the referring provider, the fact that these were not Sonoma West patients, the fact that the referring providers had not provided their samples to be tested at Sonoma West, and the ordering physicians were not employed or credentialed by Sonoma West and had not ordered Sonoma West to perform the testing.

169.   Defendants intentionally designed and operated their scheme to

COMPLAINT

conceal from Anthem the identity of the party or parties submitting the claims to Anthem.

170.   Defendants understood that, under the circumstances, and given the volume of claims received by Anthem from healthcare providers of all types, Sonoma West had a special relationship of trust and confidence toward Anthem and the BCBS Plans that gave rise to a duty to speak and disclose material information regarding the claims submitted.

171.   The scheme Defendants implemented and operated took advantage of Sonoma West's special relationship with Anthem and the BCBS Plans by hiding Defendants' wrongful billing and testing practices behind Sonoma West's name and billing information.

172.   By certifying for each claim that the billing information was "true, accurate, and complete" and that they "did not knowingly or recklessly disregard or misrepresent or conceal material facts," Defendants had a duty to disclose to Anthem information material to the claims submitted to Anthem, so as not to mislead Anthem and the BCBS Plans.

173.   At the time that each claim was submitted to Anthem, each Defendant knew that these representations were false, and that the claim forms contained material omissions.

174.   The misrepresentations made on the claims to Anthem were material to Anthem's determination of whether the claims were payable, as well as the amount at which they were payable.

175.   The omissions were similarly material to Anthem's determination of whether the claims were payable, as well as the amount at which they were payable.

176.   Specifically, by making the material misrepresentations and omissions, Defendants intended for Anthem to rely on those misrepresentations and to induce Anthem to pay Sonoma West for the claims at significantly higher hospital reimbursement rates.

COMPLAINT

177.   Defendants also hid the confirmation testing being performed by Reliance Labs by masking that testing as screening testing on claims forms – utilizing CPT code 80307 – to conceal Reliance Labs identity and involvement.

178.   Further, by submitting claims on UB-04 equivalent-forms, instead of CMS 1500 forms that are appropriate for laboratories, Defendants knew or should have known that Anthem would construe the urine drug testing as having been performed at and by a hospital for hospital patients on the orders of the hospital's physicians and would reimburse at much higher rates.

179.   Defendants knew, or should have known, that this scheme should have been disclosed to Anthem and the BCBS Plans. Yet, they failed to disclose the scheme.

180.   In failing to disclose the aforementioned material information to Anthem and the BCBS Plans, Defendants acted willfully and in bad faith.

181.   Anthem and the BCBS Plans relied on the claim forms submitted to it, including the misrepresentations and false certifications contained thereon, as well as the material omissions, when determining both whether to pay each claim and how much to pay for each claim.

182.   Had Anthem and the BCBS Plans been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it could have taken additional measures to safeguard against inappropriate billing, including instituting a prepayment review that likely would have ensured that payment was not made on such claims. Similarly, had Defendants disclosed the aforementioned material omissions, Anthem would not have made payment on the claims or would have made payment at significantly lower rates.

183.   Defendants had superior and special knowledge of the pass-through scheme, as set forth herein, and the participants in the scheme took steps designed to prevent Anthem and the BCBS Plans from identifying the scheme or the misrepresentations contained in the claim forms submitted to Anthem.

COMPLAINT

184.   As a result, at the time that Anthem received the claims, Anthem and the BCBS Plans were unaware of the pass-through scheme, and it was not reasonably discoverable by Anthem and the BCBS Plans.

185.   Anthem and the BCBS Plans reasonably relied on the material misrepresentations made, and made payment on the claims to Sonoma West.

186.   As a direct and proximate result of Defendants' material misrepresentations, Anthem and the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT II
## NEGLIGENT MISREPRESENTATION

187.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

188.   The insurance claims submitted by Defendants, or caused to be submitted by Defendants, contained material misrepresentations of facts, including but not limited to those described in the Paragraphs above.

189.   Those representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, or made under circumstances in which Defendants ought to have known their falsity.

190.    Had Anthem and the BCBS Plans been aware of the material misrepresentations, Anthem would not have paid those claims.

191.   The submission of an insurance claim to a payor constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and that the submitter did not knowingly or recklessly disregard or misrepresent material facts.

192.   Defendants had superior and special knowledge of its scheme relating to urine drug testing billing, as set forth herein, but it was not known or reasonably discoverable by Anthem.

- 35 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

193.    Defendants had a duty to disclose to Anthem and the BCBS Plans information material to the claims that Defendants submitted, or caused to be submitted so as not to mislead Anthem and the BCBS Plans.

194.    The parties understood that, under the circumstances, and given the volume of claims received by Anthem from healthcare providers of all types, Defendants had a special relationship of trust and confidence toward Anthem that gave rise to a duty to speak and disclose material information regarding the claims submitted.

195.    Defendants knew, or should have known, that this scheme should have been disclosed to Anthem.

196.    Defendants failed to disclose that they were submitting, or causing others to submit, fraudulent claims containing material misrepresentations.

197.    Defendants failed to disclose the aforementioned material information to Anthem and the BCBS Plans despite knowing that their failure to do so would induce Anthem and the BCBS Plans to act contrary to how they would act were they provided with the truth.

198.    In failing to disclose the aforementioned material information to Anthem and the BCBS Plans, Defendants acted in bad faith.

199.    Defendants intended for Anthem and the BCBS Plans to rely on the aforementioned material misrepresentations and omissions in order to induce Anthem to reimburse Sonoma West for the services allegedly provided by Sonoma West in connection with the urine drug testing claims submitted.

200.    Anthem and the BCBS Plans did not know Defendants' representations, or the representations caused to be made by Defendants, were false.

201.    Anthem and the BCBS Plans reasonably relied on the aforementioned material misrepresentations and omissions and made payment on the submitted claims.

202.    As a direct and proximate result of Defendants' material

COMPLAINT

misrepresentations and omissions, Anthem and the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT III

## RESTITUTION UNDER ERISA § 502(a)(3)

203.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

204.   Anthem and the BCBS Plans has been delegated the authority to recover overpayments made by Anthem and the BCBS Plans on the ERISA Plans' behalf.

205.   Because of the wrongful behavior listed above, Anthem and the BCBS Plans have paid millions of dollars in benefits to Sonoma West, and therefore, to the other Defendants.

206.   Pursuant to the ERISA Plans' delegation of authority to Anthem and the BCBS Plans, Anthem and the BCBS Plans have standing to sue under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

207.   As alleged above, Defendants have engaged in a scheme of submitting, or causing to be submitted intentionally misleading and fraudulent claims to Anthem for payment of benefits for charges related to laboratory services that Defendants represented, or caused to be represented, that Sonoma West was ordered to and did perform for Sonoma West patients on the orders of Sonoma West physicians.

208.   Anthem and the BCBS Plans relied on the claim information supplied by Defendants, or caused to be supplied by Defendants, in determining whether to pay the claims.

209.   Had Anthem and the BCBS Plans been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

COMPLAINT

210. Based upon the fraudulent claims Defendants submitted, or caused to be submitted to Anthem, Defendants received amounts in excess of the amounts than they were actually entitled to for those services.

211. Further, even to the extent that Defendants did not knowingly and intentionally submit misleading and fraudulent claims to Anthem, Anthem is entitled to equitable relief to enforce the terms of the ERISA Plans and recover overpayments made to Defendants.

212. This is particularly true where Defendants submitted claims, or caused claims to be submitted, of plan members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from ERISA Plan members. In such instances, Defendants accepted the terms of the ERISA Plans and submitted claims, or caused claims to be submitted, that were subject to those terms.

213. Further, by knowingly accepting payments from the ERISA Plan, Defendants became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

214. The ERISA Plans, by their terms, require the return of amounts that were erroneously paid.

215. Thus, even to the extent that Defendants did not intentionally overcharge Anthem, Anthem is still entitled to equitable relief to enforce the terms of the ERISA Plans and recover these payments in full.

216. Because of Defendants' wrongful behavior, Anthem and the BCBS Plans have paid out millions of dollars in benefits to Sonoma West that were not due or appropriate under the terms of the ERISA Plans.

217. Anthem and the BCBS Plans seek equitable restitution to cover the assets that Defendants unlawfully obtained as a result of the conduct described above.

218. Specifically, Anthem and the BCBS Plans seek an Order imposing a

COMPLAINT

constructive trust on the assets that Defendants received in the form of payments, as well as on any profits or income made by Defendants through the use of those amounts.

219.   Anthem and the BCBS Plans also seek an Order restoring the sums held in constructive trust by Defendants.

220.   Anthem and the BCBS Plans also seek recovery of its reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

**COUNT IV**

**DECLARATORY AND INJUNCTIVE RELIEF**

**UNDER ERISA § 502(a)(3) and 28 U.S.C. §§ 2201 and 2202**

221.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

222.   Anthem and the BCBS Plans have been delegated the authority to recover overpayments made by Anthem on the plans' behalf. Therefore, Anthem has standing to sue under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for declaratory and injunctive relief to enjoin any acts or practices that violate any provisions of the plans and to obtain other appropriate relief to redress such violations or enforce plan provisions.

223.   Defendants have engaged in a scheme to defraud Anthem and the BCBS Plans into paying amounts to Defendants in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

224.   There is an actual case and controversy between Anthem, the BCBS Plans, and Defendants regarding the claims Defendants has submitted and intends to continue to submit to Anthem and the BCBS Plans for the payment of benefits pursuant to the scheme described herein.

225.   Defendants' scheme is deceptive, unfair, and unlawful.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

226.   No payments are due to Defendants on any claims that are pending or may be submitted in the future pursuant to Defendants' scheme.

227.   There is a *bona fide*, present, and practical need for a declaration as to the unlawfulness of Defendants' actions and whether Anthem has the right to deny the claims implicated by Defendants' actions and scheme, including any pending or future claims.

228.   Anthem and the BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, and that any claims for payments of benefits submitted by Defendants to Anthem pursuant to the scheme described herein are not payable and void.

229.   Anthem and the BCBS Plans also seek recovery of its reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

230.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Anthem and the BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent scheme, and that any claims for payment of benefits submitted by Defendants as a result of their fraudulent scheme are non-payable and void.

**COUNT V**

**<u>VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW</u>**

231.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

232.   California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. (the "UCL"), prohibits, *inter alia*, unlawful, unfair, or fraudulent business acts or practices.

233.   Defendants engaged in unlawful, unfair, and/or deceptive business practices for the pattern of conduct alleged herein, including but not limited to:

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

a.  knowingly preparing, making, or subscribing any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim, in violation of Cal. Penal Code § 550(a)(5);

b.  knowingly making or causing to be made any false or fraudulent claim for payment of a health care benefit, in violation of Cal. Penal Code § 550(a)(6);

c.  presenting or causing to be presented any written or oral statement as part of, or in support of, a claim for payment or for other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact, in violation of Cal. Penal Code § 550(b)(1);

d.  preparing or making any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact, in violation of Cal. Penal Code § 550(b)(2);

e.  concealing, or knowingly failing to disclose the occurrence of an event that affects any person's initial or continued right to entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled, in violation of Cal. Penal Code § 550(b)(3);

f.  charging, billing, or otherwise soliciting payment for clinical laboratory services not actually rendered by Sonoma West, or under Sonoma West's direct supervision, without first apprising

Anthem's and the BCBS Plans' members of the name, address, and changes of the clinical laboratory performing the service, in violation of Cal. Bus. & Prof. Code § 655.5(a);

g.    charging additional amounts for clinical laboratory services that were not actually rendered by Sonoma West, in violation of Cal. Bus. & Prof. Code § 655.5(c);

h.    charging amounts for clinical laboratory services that were not actually rendered by Sonoma West and which exceed the amount that Sonoma West was charged by the laboratory performing the clinical laboratory services, in violation of Cal. Bus. & Prof. Code § 655.5(g); and

i.    unfairly and fraudulently implementing a scheme to substantially increase the reimbursement that Sonoma West and other Defendants received from Anthem, by submitting fraudulent claims for urine drug testing or by causing fraudulent claims for urine drug testing to be submitted.

234.   As described herein, Defendants have made representations, or caused representations to be made that are untrue and that tend to mislead or deceive, including but not limited to the following misrepresentations on the claim forms submitted to Anthem and the BCBS Plans:

a.    provider name (misrepresented as Sonoma West);

b.    provider's street address (misrepresented as Sonoma West);

c.    provider's NPI (misrepresented as Sonoma West);

d.    provider's tax identification number (misrepresented as Sonoma West);

e.    type of bill (misrepresented in some instances as "131," which represents the patient has having been an "outpatient");

f.    admission type (misrepresented in some instances as "2," which

COMPLAINT

1          indicates an urgent admission, when there was no admission);

2     g.   source of admission (misrepresented in some instances as "9,"

3          which indicates information not available, when there was no

4          admission);

5     h.   discharge status (misrepresented in some instances as "01,"

6          which indicates a discharge to home or self care when there was

7          no admission and, thus, no discharge);

8     i.   ordering physician (misrepresented as a Sonoma West

9          physician);

10    j.   attending physician (misrepresented as a Sonoma West

11         physician); and

12    k.   total charge amount (misrepresented in instances where Sonoma

13         West charged an amount higher than what it paid another lab,

14         such as Reliance Labs, to perform the actual testing, and was

15         inappropriate in light of Anthem's laboratory fee schedule).

16    235.   The submission of an insurance claim to a payor constitutes a

17   certification and representation that the information shown on the claim is true,

18   accurate, and complete, and that the submitter did not knowingly or recklessly

19   disregard or misrepresent material facts.

20    236.   Specifically, the UB-04 equivalent electronic form used by Sonoma

21   West to submit its claims to Anthem includes the following language:

22    a.   "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT

23         MISREPRESENTATION OR FALSIFICATION OF

24         ESSENTIAL INFORMATION AS REQUESTED BY THIS

25         FORM, MAY SERVE AS THE BASIS FOR CIVIL

26         MONETARY PENALTIES AND ASSESSMENTS AND MAY

27         UPON CONVICTION INCLUDE FINES AND/OR

28         IMPRISONMENT UNDER FEDERAL AND/OR STATE

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

LAW(S)."  (Emphasis in original.)

b.     "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

237.   Anthem, and other members of the public, including but not limited to Anthem's members who received services from Defendants, were likely to be deceived.

238.   Defendants' actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and are substantially injurious to customers, including Anthem and its members.

239.   Anthem and the BCBS Plans have suffered an injury-in-fact and has lost money because of Defendants' unfair and deceptive business practices.

240.   Anthem and the BCBS Plans have been substantially damaged by Defendants' unfair and deceptive business practices in an amount to be determined at trial, as well as the specific, preventive, and injunctive relief to which Anthem and the BCBS Plans are entitled under the UCL.

## COUNT VI

## TORTIOUS INTERFERENCE WITH

## ANTHEM'S CONTRACTS WITH ITS MEMBERS

241.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

242.   Each of the members for whom Defendants submitted claims, or caused claims to be submitted, received healthcare benefits pursuant to a benefit plan offered and/or administered by Anthem and the BCBS Plans.

243.   The terms of the members' benefit plans were set forth in individual medical contracts between the members and Anthem and the BCBS Plans.

244.   These contracts contained provisions that required members to satisfy

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

certain obligations, including their cost-sharing responsibilities (*e.g.*, copayments, coinsurance, and/or deductibles) by making payments to providers.

245. Defendants knew or reasonably should have known that the members' plans required the members to satisfy their payment responsibilities.

246. Despite this knowledge, Defendants intentionally procured the breach of members' contracts by waiving the members' cost-sharing responsibilities.

247. Defendants' procurement of these breaches was without justification or privilege.

248. Had Defendants collected, or caused to be collected, the Anthem member's cost-sharing responsibilities, those members likely would have alerted Anthem and the BCBS Plans to Defendants' improper and unlawful conduct because of the substantial amount of money that they would have owed.

249. The breaches Defendants procured have resulted in significant damages to Anthem and the BCBS Plans in the form of unnecessary payments Anthem made to Sonoma West, and therefore other Defendants, subsequent to those breaches.

250. Anthem and the BCBS Plans are entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Defendants from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT VII

## AIDING AND ABETTING TORTIOUS CONDUCT

251. Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

252. Defendants and others known and unknown committed torts against Anthem and the BCBS Plans by fraudulently and negligently misrepresenting their practices and claims for reimbursement, and by interfering with Anthem and the BCBS Plans' contracts with their members.

253.   Defendants formed an agreement with each other and other co-conspirators to commit the unlawful acts described in this Complaint.

254.   Defendants and other co-conspirators committed wrongful acts in furtherance of their common scheme.

255.   Defendants knew that their co-conspirators' conduct constituted a breach of duty.

256.   Defendants gave substantial assistance or encouragement to the co-conspirators to breach such duties.

257.   Defendants' wrongful acts were a substantial factor in causing harm to Anthem and the BCBS Plans.

258.   Anthem and the BCBS Plans have been injured by the wrongful scheme in a significant amount to be determined at trial.

## COUNT VIII
## **MONEY HAD AND RECEIVED**

259.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

260.   Defendants have received monies from Anthem and the BCBS Plans that they should not have received and to which Defendants are not entitled.

261.   Specifically, Defendants received reimbursements from Anthem and the BCBS Plans for claims that they submitted that should not have been paid.

262.   Anthem and the BCBS Plans paid these reimbursements on belief that the claims submitted by Defendants were appropriate for reimbursement when, in fact, they were not.

263.   The monies paid have not been used for the benefit of Anthem or the BCBS Plans or their members.

264.   Similarly, Defendants have not returned the monies to Anthem or the BCBS Plans.

265.   Accordingly, Anthem and the BCBS Plans are entitled to the return of

COMPLAINT

these monies returned in an amount to be determined at trial.

## COUNT IX

### UNJUST ENRICHMENT

266.   Anthem and the BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

267.   Defendants fraudulently used the name and billing information of Sonoma West to submit, or cause the submission of, claims to Anthem and the BCBS Plans for services that were not performed at or by Sonoma West, or ordered by Sonoma West physicians, or on behalf of Sonoma West patients, whose name and billing information appeared on the claims Defendants submitted, or caused to be submitted, to Anthem and the BCBS Plans. Sonoma West had no reason to be involved in the testing or billing of the claims submitted but for the substantially higher reimbursement rates it would seek from insurers, including Anthem. This was especially true in light of the prepayment review Anthem had instituted with respect to claims submitted by Reliance Labs.

268.   Anthem, relying on Defendants' representations that the services being billed for using Sonoma West's name and billing information were performed at and by Sonoma West and on behalf of Sonoma West patients as ordered by Sonoma West physicians, issued payment to Sonoma West who then distributed those payments to Defendants.

269.   Defendants have wrongfully obtained payments issued by Anthem and the BCBS Plans to Sonoma West.

270.   Defendants have unjustly retained those benefits.

271.   Defendants should be required to make restitution for the benefits they received, retained, and appropriated because justice and equity require such restitution.

272.   Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous

1    providers at the expense of insurance companies and patients.

2         273.   Anthem and the BCBS Plans are entitled to restitution in an amount to

3    be determined at trial, including but not limited to all amounts Defendants received

4    from Anthem and the BCBS Plans because of Defendants' pass-through scheme.

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests an award in its favor and granting the following relief:

a.     An award of actual and consequential damages in an amount to be determined at trial, plus interest;

b.     An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

c.     An injunction prohibiting Defendants from continuing their scheme;

d.     An award of Plaintiffs' costs, including reasonable attorneys' fees, in accordance with 29 U.S.C. § 1132(g)(1);

e.     An award of punitive damages;

f.     Equitable relief as requested herein;

g.     Formation of a constructive trust; and

h.     Any other relief deemed just, proper, and/or equitable.


## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

COMPLAINT

1

DATED:  June 1, 2018                    **ROBINS KAPLAN LLP**

2

3                                       By:___/s/ David Martinez_____

4                                       Roman M. Silberfeld (Cal. Bar # 62783)
                                        David Martinez (Cal. Bar # 193183)
5                                       2049 Century Park East, Suite 3400
                                        Los Angeles, California 90067
6                                       T: (310) 552-0130
                                        F: (310) 229-5800
7                                       rsilberfeld@robinskaplan.com
8                                       dmartinez@robinskaplan.com

9

10                                      Jeffrey S. Gleason (*pro hac vice* to be filed)
                                        Jamie R. Kurtz (*pro hac vice* to be filed)
11                                      Nathaniel J. Moore (Cal. Bar # 277206)
                                        Luke A. Hasskamp (Cal. Bar # 280872)
12                                      800 LaSalle Avenue
                                        Minneapolis, Minnesota 55402
13                                      T: (612) 349-8500
                                        F: (612) 339-4181
14                                      jgleason@robinskaplan.com
15                                      jkurtz@robinskaplan.com
                                        nmoore@robinskaplan.com
16                                      lhasskamp@robinskaplan.com

17

18                                      *Counsel for Blue Cross of California*
19                                      *d/b/a Anthem Blue Cross, et al.*

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

# EXHIBIT A

 

**NOTICE AND AGENDA**
**JOINT**
**PALM DRIVE HEALTH CARE DISTRICT**
**BOARD OF DIRECTORS AND GOVERNING BODY MEETING**
**SPECIAL MEETING**

**June 22, 2017**
**4:30 p.m.**
**Open Session**

Sonoma West Medical Center
Conference Room
501 Petaluma Avenue
Sebastopol, CA 95472
(707) 823-3586

**Our Vision:** Through engagement with our diverse West County population the district will promote improved health and well being.

**Our Mission:** Palm Drive Health Care District exists to deliver access to quality and compassionate health services responsive to the needs of our District.

**Our Values:** Integrity- Leadership – Caring - Perseverance

### PLEASE TURN YOUR CELL PHONES OFF

## CALL TO ORDER BY CHAIRMAN COLTHURST

## ROLL CALL

## APPROVAL OF AGENDA                                  Chair Colthurst

## PUBLIC COMMENTS

*The chair will accept comments from the audience on any items not listed on the agenda. Questions may be referred to staff for response at a later time. Please limit your comments to 3 minutes.*

## DISCUSSON AND ACTION ITEMS

1. Discussion, consideration and possible Action on a Management Contract with Durall Capital Holdings and Sonoma West Medical Center.            (Action)(B.Arnone/D.Colthurst)

2. Discussion, consideration and possible Action on a Laboratory Contract with Durall Capital Holdings and            (Action)(B.Arnone/D.Colthurst)

**Exhibit A, Page 51**

*1*

Sonoma West Medical Center.


## ADJOURNMENT

| Palm Drive Health Care District |
|---|
| Members of the public have the right to speak on any item on the published agenda.  If you wish to speak about a matter not on the published agenda, please make your comments during the portion of the meeting designated for Public Comments. Please limit your remarks to three minutes.  Please note that, with some exceptions, the District Board does not engage in discussion or take action on non-agenized matters.  However, the board may respond briefly to public comments, refer matters to staff; ask questions for clarification, or schedule matters for future agenda. Materials related to open session items on this agenda that are submitted to the Board or committee after distribution of the agenda packet are available for public inspection during normal business hours at 612 Petaluma Avenue, Sebastopol, CA. |

**Consent Items:**
The Board agenda may include items on a consent calendar.  Consent calendar items are routine matters or matters which have been reviewed by the board previously.  These items may be approved by one motion without discussion unless a board member requests that the item be taken off the consent calendar. Items removed from the consent calendar will be taken up upon completion of action on the remainder of the items on the consent calendar.

**American Disability Act (ADA)**
The Sonoma West Medical Center complies with ADA (American Disabilities Act) requirements and upon request, will attempt to reasonably accommodate individuals with disabilities by making meeting material available in appropriate alternative formats (pursuant to Government Code Section 54953.2). Anyone requiring reasonable accommodation to participate in the meeting should contact Janet Harris, Executive Assistant at (707) 823-3586.

**Exhibit A, Page 52**

2

## SUMMARY OF AGREEMENTS BETWEEN SWMC & DURALL CPAITIAL HOLDINGS LLC
## To PERFORM TOXICOLOGY TESTING FOR INDIVIDUALS IN DRUG REHABILITATION

### GENERAL

All agreements have been prepared and reviewed by Lori Ferguson, a HansonBridgett health care attorney and with consultation with Allan Jergesen, a HB nonprofit attorney to assure that all agreements comply with federal, California, and nonprofit law and regulations.

### BUSINESS ASSOCIATES AGREEMENT

Agreement between SWMC and Durall Capital Holdings LLC to abide by HIPPA and Clinical Health Act of 2009.

### LABORATORY MANAGEMENT SERVICES AGREEMENT

SWMC will perform initial toxicology testing from samples sent by Durall Capital Holdings LLC from individuals in drug rehab.  The Tests will be performed on new equipment (cost approximately $100,000) to be purchased by Durall Capital Holdings LLC and to be invoiced and paid for by SWMC after six months of performing toxicology testing.  In addition, the reagent cost, personnel expense and overhead will be paid for by SWMC.

Durall Capital Holdings LLC will be paid $150,000 per month for managing the toxicology laboratory.

The volume of testing per Aaron Durall will be 10,000 to 15,000 tests [should be panels per WJA] per month.

The expected reimbursement is estimated to be $35.00 per test in a panel.  The number of tests in a panel can be from3 to 25.  The average tests per panel is expected to be 10 (additional data is being gathered).  SWMC will bill for the initial panel of testing and collect for the initial panel of testing.

It is expected that twenty percent of the panels will not be reimbursed because SWMC will be out of the insurance company's network.  The additional expected collections is than estimated to be $2,800,000 per month.

The charge capture and billing will be done by Durall Capital Holdings LLC under the Hospital's license, CLIAlicense, and insurance contracts.  Reimbursement will come to SWMC.

Cost of reagents, cost of personnel and overhead is estimated (further research into total cost is being done) to be $773,000 per month.  This would put the outflow of funds at an estimated $923,000 per month.

**Exhibit A, Page 53**

## LABORATORY SERVIE AGREEMENT FOR CONFIRMATION TESTING

SWMC will perform the initial panel of test that will determine one or more broad category of drugs but not a specific drug. Confirmation testing is done after one or more drugs are indicated to determine a specific drug or drugs. We are told that individuals in rehabilitation are usually on more than one drug.

Once SWMC's general toxicology testing indicates one or more drugs, SWMC will send the specimen to Durall Capital Holdings LLC,as a reference laboratory,for Confirmation testing. The number of confirmation tests performed will depend upon the number of general category of drugs indicated. It is estimated that 3.5 confirmation tests will be performed per specimen (additional information is being obtained to confirm numbers).

SWMC will bill for the reference laboratory testing under the Hospital's license, CLIA license, and insurance contracts. The billing will be done by Durall Capital Holdings LLC. Reimbursement will come to SWMC. [This is in addition to, not part of, the billing and reimbursement under the Laboratory Management Services Agreement per WJA]

SWMC will pay Durall Capital Holdings LLC $200 per test but no more than actual reimbursement less $15. The $15 is to account for the lab management fee ($150,000 per month divided by 10,000 tests per month).

Legal venue will be California and California law except for payments due Durall Capital Holdings LLC which action will be brought in and under Florida law.

## MANAGEMENT SERVICE AGREEMENT

This agreement is similar to the Pipeline Agreement for managing the Hospital. Durall Capital Holdings LLC owns and manages two rural hospitals and is in the process of buying a third hospital.

Durall Capital Holdings LLC will manage all aspects of the hospital operations and abide by all aspects of the MSSA and Governing Body. The CEO and CFO will be Durall Capital Holdings LLC employees. Durall Capital Holdings will bring in the necessary personnel to right areas of the operations that are not performing at the highest levels possible at no additional cost except the management fee.

The management for the first six months will be $80,000 (calculated based on a $50,000 management and $30,000 to cover DCH's personnel) per month. The next six months the management fee will be $70,000 per month ($50,000 management fee and $20,000 to cover CEO and CFO expense). The management fee will be adjusted annually (12 months from the initiation of the contract) by the US annual inflation rate.

**Exhibit A, Page 54**

An additional annual fee may be paid in the amount of $200,000 when the Hospital has working cash liquidity in the amount of $2,000,000 plus the Hospital must be fully current on all accounts payable obligations.

**LOAN AGREEMENT**

The contributions of $2,100,000 made thus far will need to be converted to a loan. The purpose is to comply with federal anti-kickback laws and nonprofit laws. Otherwise, the contributions will be viewed as a payment to get a very lucrative contract unless formalized in a requirement to pay Capital Holdings LLC back.

The loan structure will be for payments to begin when SWMC has $2,000,000 and Durall Capital Holdings management fee in cash working capital.

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (this "Agreement") is entered into to be effective as of the Effective Date by and between Sonoma West Medical Center, a California nonprofit public benefit corporation ("SWMC"), and Durall Capital Holdings, LLC, a Florida limited liability company ("Manager"). SWMC and Manager are sometimes referred to herein individually as a "Party" or collectively as the "Parties."

### RECITALS

WHEREAS, pursuant to the terms of a Management and Staffing Services Agreement dated March 18, 2015 (the "MSSA"), SWMC operates a general acute care hospital in Sebastopol, California (the "Hospital") that is owned by Palm Drive Health Care District (the "District"); and

WHEREAS, in accordance with the MSSA and the Bylaws of the District, a subcommittee of the District's Board of Directors was established to serve as the governing body of the Hospital (the "Governing Body"); and

WHEREAS, Manager's principals and staff have demonstrated expertise in managing and improving the performance of hospitals; and

WHEREAS, SWMC desires to retain Manager to provide services required of SWMC under the MSSA to administer, supervise, and manage the Hospital, and Manager desires to provide those services in the manner required by the MSSA on behalf of SWMC commencing on _____ __, 2017, or as soon thereafter as the conditions set forth in Section 13.2 are satisfied (the "Effective Date") on the terms and conditions set forth hereinafter; and

WHEREAS, certain capitalized terms have the meanings ascribed to them as set forth above or in Section 17 below.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants and promises hereinafter set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1. **Control of Hospital Operations**

Notwithstanding anything set forth below to the contrary, the Governing Body shall possess ultimate authority and control over the operations of, and shall be responsible for the approval of policies with respect to, the Hospital (not inconsistent with the Strategic Plan and Budget as defined below). SWMC will ensure that the Governing Body exercises all functions that by Applicable Laws, payer/program agreements, Conditions of Participation, long-term debt covenants or accreditation standards must be exercised by such Governing Body. Notwithstanding the authority granted to Manager herein, Manager and SWMC agree that the Governing Body shall at all times exercise ultimate control over the Hospital and shall approve general operating policies to be carried out by Manager pursuant to the MSSA and this Agreement. SWMC agrees that the Governing Body shall delegate sufficient authority to Manager (subject to ultimate oversight by the District Board of Directors) to enable Manager

**Exhibit A, Page 56**

6

effectively to perform its functions hereunder. By entering into this Agreement, SWMC does not, and shall not in the future, delegate to Manager any of the powers, duties, and responsibilities vested in the Governing Body by law, SWMC's governing documents (including the SWMC Bylaws), or as otherwise set forth in this Section 1.

2.      **Retention of Manager: Additional Management Services**.

2.1      Retention of Manager; Exclusivity. Subject to the terms and conditions of this Agreement, as of the Effective Date, SWMC hereby retains and appoints Manager to manage the Hospital on behalf of SWMC in accordance with, and subject to, the terms of the MSSA, a copy of which is attached hereto and incorporated herein by this reference. During the Term of this Agreement (as defined below in Section 13), Manager shall be the exclusive provider to the Hospital of such services as are described in Section 4 (the "Management Services"), which is consistent with the authority granted to SWMC by the MSSA and under the SWMC Bylaws.

2.2      Approval of Agreement. SWMC hereby represents and affirms that the Board of Directors of SWMC authorized or otherwise approved the decision to enter into this Agreement between the Parties and that all approvals required from the Governing Body and the District have been, or will be, obtained prior to the Effective Date. Manager accepts such appointment and agrees to manage the Hospital in accordance with the terms of the MSSA, and in a commercially reasonable manner. Manager further agrees to devote sufficient time and efforts thereto in accordance with the terms and conditions set forth this Agreement. Manager acknowledges that the Governing Body and the District Board of Directors are subject to the Brown Act and other open government laws applicable to California public entities. Manager will cooperate and work with SWMC and the Governing Body to maintain compliance with such laws.

3.      **Strategic Plan and Budget**.

3.1      Strategic Plan and Budget. Manager shall collaborate with the Governing Body to develop an annual plan setting forth certain details regarding the strategic, operational and capital activities that Manager shall undertake and oversee on behalf of SWMC with respect to the Hospital and the budgets regarding such activities (as amended from time to time, the "Strategic Plan and Budget"), which shall include, but not be limited to, the following:

(a)      performance improvement initiatives, business development objectives, cost reduction plans, synergistic opportunities and efficiency improvements;

(b)      strategic, programmatic, and service line initiatives (including their operating and capital requirements) for the Hospital;

(c)      an annual operating budget setting forth an estimate of operating revenues and expenses for the following year;

(d)      an annual capital expenditures budget outlining a program of capital expenditures for the next fiscal year; and

(e)      an annual projection of cash receipts and disbursements based upon the proposed capital expenditures and operating budgets, which projection shall contain recommendations concerning use of excess cash flow, if any, and

**Exhibit A, Page 57**

(f)     such longer term financial projections for operations of the Hospital as the Governing Body may reasonably request.

3.2     Modifications. The Parties shall consult with each other on an ongoing basis throughout the Term to identify and agree upon any proposed modifications to the Strategic Plan and Budget required to enhance the quality and economic viability of the Hospital while continuing to further the District's missions, including, but not limited to, those which include charitable, educational and community health missions. Manager shall be responsible for developing proposed additions, modifications and improvements to the Strategic Plan and Budget and shall propose such changes to the Governing Body from time to time but no less than annually in accordance with Section 5.3. SWMC, and the Governing Body, shall promptly review all proposed modifications or additions to the Strategic Plan and Budget and  the written consent of the Governing Body and the District (or their designees specified in writing) shall be required for any change to the Strategic Plan and Budget. In the event proposed revisions to the Strategic Plan and Budget are not approved, the most recently approved Strategic Plan and Budget shall continue in full force and effect until further modified or until this Agreement expires or is otherwise terminated.

3.3     Expenses. SWMC shall remain solely and exclusively responsible for any and all costs of operations as it relates to SWMC and the Hospital, whether or not revenues generated from the operations of the Hospital are sufficient to support the expenditures contemplated by the Strategic Plan and Budget.

4.     **Management Services**

4.1     Management Services. Manager shall use commercially reasonable efforts to oversee the efficient and orderly operation of the Hospital and shall provide the following services in accordance with the terms of this Agreement and the MSSA, or if not therein specified then at least at the minimum level of prevailing industry practices (the "Management Services"), specifically including the following (compensation for which, unless otherwise specifically set forth herein, shall be included within the Management Fee payable to Manager described in Section 11 hereof). In the event of a conflict between the terms of the MSSA and the terms of this Agreement, the terms of the MSSA shall prevail.

4.2     Staffing.

(a)     During the Term, and subject to approval by the Governing Body and the District Board, Manager shall provide, through contract or otherwise, at its sole expense, at a minimum, a Chief Executive Officer/Administrator and Chief Financial Officer/Controller on behalf of SWMC (the "Senior Executives"). Each of the senior executives will provide no less than 40 hours each week (an average of 160 hours/month) of onsite time (subject to reasonable vacation time and other pre-existing obligations).The Senior Executives shall provide executive management services to SWMC and shall be subject to and comply with all SWMC policies, requirements and duties applicable to such respective positions, subject to advance written notice to the Senior Executives. Subject to prior approval by the Governing Body and the District Board, Senior Executives may be replaced by competent individuals from time to time as deemed appropriate by Manager in its reasonable discretion. In addition, Manager's principals, advisors, and other personnel (the "Senior Advisors") shall be available to provide management support, consult with SWMC personnel, visit and perform periodic reviews and evaluations of the Hospital, and generally advise SWMC, the Governing Body and the District Board regarding the operations and business of the Hospital in order to ensure effective

management thereof. The Parties acknowledge and agree that the composition of such advisory services by Senior Advisors at any given time may vary depending on the needs of SWMC or the Hospital as determined by Manager in its reasonable discretion and/or at SWMC's reasonable request and Manager's agreement thereto, which agreement shall not be unreasonably conditioned, withheld or delayed.

(b)    Subject to the Strategic Plan and Budget, and applicable State and Federal laws, Manager shall determine necessary and appropriate staffing levels for the Hospital, and Manager shall oversee and administer the recruitment and hiring in the name of and on behalf of SWMC of nurses, technicians, administrative, and other staff as are determined to be necessary or appropriate for the operation of the Hospital. Manager shall oversee and administer all payroll functions for the Hospital, including, but not limited to, payroll payments, appropriate payroll withholding, and general payroll accounting and payment of all payroll taxes and employee benefit cost for which the Hospital is responsible.

(c)    All personnel required to be employed directly by SWMC under the MSSA and Applicable Laws shall be employees or contractors of SWMC ("SWMC Personnel") and not Manager, and shall be subject to SWMC's personnel policies. All wages, benefits and other payroll expenses related to SWMC Personnel shall be the sole responsibility of SWMC. For the avoidance of doubt, the term SWMC Personnel does not include any Senior Executives, Senior Advisors or personnel of Manager provided by Manager under this Agreement.

(d)    Manager shall administer and oversee the enforcement of personnel policies established in accordance with SWMC's contractual obligations, employment policies and the Strategic Plan and Budget in connection with hiring, managing, and discharging SWMC Personnel.

(e)    Manager, as the authorized agent of SWMC, shall (i) recommend the appropriate number and qualifications of SWMC Personnel required for the efficient and effective operations of the Hospital, and, (ii) in accordance with the Strategic Plan and Budget, implement wage scales, employee benefit packages, in-service training programs, staffing schedules, and job descriptions for SWMC Personnel, all in order to accomplish the policies established by SWMC.

4.3    Training. Manager shall be responsible for educational training programs for SWMC Personnel designed to improve inpatient and outpatient care, case management, clinical documentation, including use of electronic medical records and related systems, departmental operations, and such other matters as Manager may determine from time to time to be beneficial to the efficient operation of the Hospital.

4.4    Contracts. Manager shall assist the Senior Executives in negotiating and consummating agreements and contracts for and on behalf of the Hospital in the name of SWMC in the usual and ordinary course of business, all in accordance with the Strategic Plan and Budget.

4.5    Laws: Accreditations. As appropriate, Manager shall provide assistance in obtaining and maintaining all licenses, permits, approvals and certificates of accreditation required for the operation of the Hospital and pursuant to Applicable Laws.

4.6     Medical Records. Manager shall administer and oversee systems for the timely, accurate and efficient creation, filing, security, sharing among care givers and other lawful persons, and retrieval at the Hospital, of all medical records, charts, and files, all in accordance with applicable law, the requirements of payors (contractual or otherwise), the needs of effective risk management and compliance systems, and other best practices.

4.7     HIPAA and Business Associate Agreement. The Parties hereby acknowledge and agree to enter into and comply with the Business Associate Agreement attached hereto as Exhibit A, to evidence their compliance with privacy standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. Parts 160 and 164, subparts A, D and E, the security standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. Parts 160, 162 and 164, subpart C, and the requirements of Title XIII, Subtitle D of the Health Information Technology for Economic and Clinical Health (HITECH) Act provisions of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§ 17921-17954, and all its implementing regulations, when and as each is effective and compliance is required, as well as any applicable state confidentiality laws.

4.8     Support Services. Manager shall administer and oversee customary support services for the Hospital, including, but not limited to, housekeeping, maintenance (including repair and maintenance of the interior and exterior of the Hospital' buildings, and grounds), janitorial, security and food services.

4.9     Information Technology Systems and Records. The parties acknowledge that, under section 2.2(e) of the MSSA, EHRI, Inc. donated a cloud based electronic medical record software system known as Harmoni MD to SWMC for use at the Hospital. Subject to the rights and obligations undertaken pursuant to that donation, Manager shall administer and oversee the maintenance and operation of accounting, auditing, budgeting, reimbursement, revenue cycle, payor reporting and reconciliation, electronic health record, computerized physician order entry, and other clinical service records and other information technology systems required for the efficient management of the Hospital, including compliance with payor program requirements and/or contractual obligations. Manager shall administer and oversee the preparation and maintenance of all books and records regarding operations and financial transactions pertaining to the Hospital and shall ensure copies of such books and records are made available to the Governing Body or its designee upon reasonable request.

4.10    Establishment of Operational Policies. Manager shall develop and recommend to SWMC policies, procedures, and standards of operation, maintenance, pricing, and other matters affecting the Hospital and the operation thereof, consistent with the Strategic Plan and Budget.

4.11    Acquisition of Property. Manager shall be responsible for the oversight of acquisition of all personal property, equipment, supplies, and inventory as may be necessary to operate the Hospital in accordance with (i) the MSSA and this Agreement; (ii) the Strategic Plan and Budget; (iii) Applicable Laws; and (iv) applicable standards and guidelines on accreditation promulgated by the applicable Accreditation Organization. Manager shall have the right to utilize such personal property, equipment, supplies, and inventory at the Hospital as Manager reasonably deems necessary and appropriate to fulfill its obligations hereunder.

4.12    Public Relations. Manager shall implement such advertising, marketing and other activities as Manager deems appropriate for the efficient operation of the Hospital.

Exhibit A, Page 60

*10*

Subject to the foregoing, from time to time, Manager shall engage in marketing and public relations activities consistent with Applicable Laws and designed to enhance the Hospital's image and reputation and to secure and maintain patients at the Hospital.

4.13    Community Support. Manager shall assist SWMC and the District in enhancing the Hospital's community service mission and engagement in community activities that educate, inspire, and improve the quality of life and overall health outcomes of the patient populations served by the Hospital. Manager shall propose and implement, after proper approvals, increases in services to support the needs of the community and greater Bay Area.

4.14    Liability Insurance. Manager shall obtain and/or maintain in effect, on behalf of and at the sole expense of SWMC, throughout the Term of this Agreement, such policies (or programs) of property/casualty coverage, public liability, professional liability and hazard insurance and other customary insurance coverages in commercially reasonable amounts for and on behalf of the Hospital and consistent with the Strategic Plan and Budget or, in the absence of such specifications, as Manager considers reasonable based upon criteria generally used  by Manager. Manager and the Senior Executives shall be covered under SWMC's Directors' and Officers' liability, Errors and Omissions liability, professional liability and other insurance policies, and the Senior Executives shall be insured under any such policies to the same extent as SWMC's other officers and directors. Throughout the Term, Manager shall maintain its own policies of Directors' and Officers' liability, Errors and Omissions liability, professional liability and other insurance policies covering their respective operations, officers, directors, employees and agents, as is customary in the hospital management industry, all with commercially reasonable amounts and terms. Professional liability insurance shall have minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate.

4.15    Revenue Cycle. Manager shall administer and oversee the development of appropriate and reimbursable charges and systems for and monitoring of appropriate charge capture, billing for services rendered by the Hospital and the collection of all accounts due to the Hospital in accordance with lawful charge master and collection policies developed by Manager pursuant to the Strategic Plan and Budget, as well as any and all applicable third-party payor program or written agreement. Manager shall be entitled to obtain, on behalf, and at the expense, of SWMC the assistance of one or more collection agencies who shall be required to act in accordance with Applicable Laws and generally recognized practices for hospitals (such as the AHA Guidelines). Manager shall exercise commercially reasonable care in managing these accounts. Manager will hold in trust available cash for the benefit of SWMC in accordance with the Strategic Plan and Budget, shall maintain accounts and/or certificates of deposit with a financial institution or institutions designated by SWMC, and shall report monthly financials to the Governing Body. Financials shall include an income statement, balance sheet, cash flow statement, AP reports, bench marking reports, AR reports, utilization statistics, departmental reports, productivity statistics and inpatient/outpatient insurance utilization, and other reports that may be reasonably requested from time to time.

4.16    Bank Accounts. SWMC shall maintain bank accounts (the "SWMC Accounts") necessary for operations of the Hospital, and Manager shall cause to be deposited therein all receipts and money arising from operations of the Hospital. It is anticipated that the Senior Executives, and such other individuals as are approved by the SWMC Board from time to time, shall have the right to authorize disbursements from SWMC Accounts on behalf of SWMC in such amounts and at such times as the same are required and with proper internal controls and accounting practices as addressed further below.

**Exhibit A, Page 61**

4.17   Payment of Expenses. Except as otherwise specifically provided in this Agreement, the MSSA, and subject to the standard policies of SWMC, Manager shall timely and accurately pay on behalf of SWMC, from funds generated by the Hospital in the SWMC Accounts, subject to cash availability, where and as due, and without delinquency or default, all proper debts, liabilities, costs, and expenses ("Expenses") related to the ownership, management and operation of the Hospital, including any taxes and all bills for goods delivered or services rendered to the Hospital and all personal property, supplies; inventory and all other items necessary for operation of the Hospital and to provide the Management Services described herein. Manager shall contest by appropriate and legal means (but may not bring any lawsuit without complying with such guidelines and policies as are established from time to time by the Governing Body) on behalf of SWMC, any claims for payment asserted against the Hospital that Manager, in good faith, considers erroneous or improper.

4.18   Agency. Within the scope of functions delegated to Manager hereunder, Applicable Laws and subject to other conditions set forth herein, Manager shall have the right to act and shall assist SWMC as the agent and attorney-in-fact of SWMC in the procuring of licenses, permits and other approvals, the payment and collection of accounts, and in all other activities necessary, appropriate, or useful to Manager in the carrying out of its duties as specified in the preceding paragraphs of this Section 4.

4.19   Corporate-Based Consulting Services. Manager shall provide corporate-based consulting services to SWMC upon request..

4.20   Compliance with Law and Professional Standards. In performing its services hereunder, and in all conduct related to this Agreement, Manager will comply with all Applicable Laws and with generally recognized professional standards for similar services within the hospital management industry.

**5.**   **Reports to SWMC**. For the purpose of keeping informed with respect to the operation of the Hospital and Manager's performance hereunder, Manager shall arrange for the preparation and delivery to the Governing Body or its designee the following:

5.1   Viability Assessment. Within one hundred twenty (120) days following the Effective Date, Manager will provide to the Governing Body and the SWMC Board Manager's assessment of the Hospital's continued viability.

5.2   Financial Statements. Within thirty (30) days after the close of each calendar month, monthly unaudited financial statements of the Hospital, containing a balance sheet and a statement of income, prepared in reasonable detail and in accordance with generally accepted accounting principles and the requirements of the Government Accounting Standards Board ("GASB") as applicable; and other financial statistical reports and reports reasonably requested by the Governing Bodies.

(b)   Annually, within one hundred eighty (180) days after the end of each fiscal year of the Hospital, audited financial statements of the Hospital ("Audited Financial Statements"), including a balance sheet, statement of income, and statement of changes in financial position, prepared in reasonable detail and in accordance with generally accepted accounting principles and GASB, as applicable, and accompanied by a report of the independent auditor of the Hospital (selected by the Governing Body). This will include District financials reported with SWMC financials as required by the GASB guidelines.

**Exhibit A, Page 62**

/2

5.3     Strategic Plan and Budget . An annual updated Strategic Plan and Budget, to be delivered at least thirty (30) days prior to the beginning of each SWMC Fiscal Year during the Term of this Agreement, prepared in collaboration with the Governing Body.

All reports deliverable hereunder shall be generated by Manager using the then-existing systems of SWMC and delivery of such reports is conditioned upon the capability, availability, cooperation and access to, such SWMC systems and personnel by Manager. Manager shall hold monthly meetings with the Governing Body or its designee specified in writing to discuss the reports required pursuant to this Agreement.

**6.     Access to Records**. Each Party agrees to provide the other, promptly when received, with access to all material reports, other filings, and communications from governmental authorities or agencies having jurisdiction over the Hospital.

**7.     Medical Staff, Quality of Care**.

7.1     Cooperation with Medical Staff. Manager shall reasonably cooperate and maintain liaisons with the medical staff of the Hospital (collectively, the "Medical Staff') and shall advise and assist the Medical Staff concerning procedural matters and standards and guidelines on accreditation promulgated by an applicable Accreditation Organization. However, SWMC hereby agrees that all medical, ethical and professional matters, including control of and questions relating to the composition, qualifications and responsibilities of the Medical Staff, shall be the sole responsibility of the Governing Body and the medical executive committees of the Medical Staff of the Hospital.

**8.     Laws; Licenses; Reimbursement Programs; Accreditation**

8.1     Compliance with Law. In performing services hereunder and in all other actions related to this Agreement, Manager and all personnel of Manager shall comply with Applicable Laws relating to the Hospital and the Management Services, including without limitation all agencies having jurisdiction over health care services, billing, labor/employment, taxation, environmental compliance, antitrust, or physical facility compliance. Manager shall assist SWMC to operate the Hospital so that SWMC maintains all necessary licenses, permits, consents, and approvals from all governmental agencies that have jurisdiction over the operation of the Hospital. Manager shall not be obligated to SWMC for failure of the Hospital to comply with any such laws, rules, and regulations or for failure of the Hospital to maintain any such licenses, permits, consents, and approvals, to the extent that the failure is due to financial limitations of SWMC or the Hospital or to the design or construction of the Hospital, or is attributable to acts or omissions of SWMC or its agents (other than Manager or Manager's personnel, employees or contractors).

8.2     Charges for Services. Manager shall use its commercially reasonable efforts to promote compliance with all Applicable Laws and payer contracts or program requirements concerning coding, billing, charging, collecting and reporting on fees received for services of or provided in the Hospital and within the acceptable limits of federal, state, and third-party programs.

8.3     Accreditation. Manager shall use its commercially reasonable efforts to manage the Hospital in at least the manner necessary to maintain accreditation by an Accreditation Organization.

**Exhibit A, Page 63**

*13*

8.4     No Violation. Neither SWMC nor Manager shall knowingly cause or permit any action that shall (i) cause any governmental authority having jurisdiction over the operation of the Hospital to institute any proceeding for the rescission, suspension, or revocation of any license, permit, consent, or approval; (ii) cause the applicable Accreditation Organization to institute any proceeding or action to revoke its accreditation of the Hospital; (iii) cause a termination of, or adversely affect, SWMC's participation in Medicare, Medicaid, or any other public or private medical payment program or Payer; or (iv) cause SWMC or the District to violate or default under any of its legal obligations under debt financings.

## 9.     Limitations on Manager's Exercise of Duties.

9.1     SWMC Unilateral Actions. Notwithstanding any term herein to the contrary, if SWMC undertakes any material budgetary or operating decision or action that is solely within its discretion hereunder or including without limitation any major actions or decisions, which was against the advice of Manager as set forth in a written notice to SWMC, prior to or promptly after such unilateral decision or action by SWMC, SWMC agrees to provide Manager with reasonable advance written notice of any scheduled meeting of the SWMC Board or the Governing Body and afford Manager an opportunity to submit materials for the purpose of addressing such action and any related matters at such meeting.

9.2     Non-Recurring Actions. In the event Manager desires to take any non-recurring or one-time actions not contemplated by the Strategic Plan and Budget, or that otherwise require the advance written consent or approval of the Governing Body, the SWMC Board or the District Board (or their designees) pursuant to this Agreement but which do not require a formal modification to the Strategic Plan and Budget, the following provisions shall apply:

(a)     a request for consent or approval of the applicable entity with approval rights (the "Approving Party") shall be provided to such Party by Manager. Such request shall include a reasonably detailed description of the act or event for which consent is sought, and shall be delivered to the Approving Party and to the official designated by SWMC at the designated address via hand delivery or certified U.S. Mail or by facsimile or email and deemed received as set forth in Section 19.4 herein with respect to each such form of notice;

(b)     the Approving Party shall review, consider and approve, or require further review of, such proposed act or event within ten (10) business days of receiving such request; provided, that, such period shall be reasonably extended to provide the Approving Party with additional opportunities to review or consider any such acts or events if requested in writing accompanied by a reasonably detailed explanation of the reasons for extension and a commitment to provide a final decision within a stated period of time not to exceed thirty (30) days from the date of the initial request or such longer period as is reasonable given the circumstances.

## 10.     Defense of Claims: Exculpation.

10.1     SWMC.

(a)     Each Party ("Indemnitor") agrees to defend, indemnify, and hold harmless the other Party ("Indemnitee") and its affiliates, subsidiaries, successors and assigns, directors, trustees, members, officers, employees, and agents, including, but not limited to, its Senior Executives and the Governing Body, District Board, and their members, from and against

**Exhibit A, Page 64**

*14*

any and all liability, loss, expense (including reasonable attorneys' fees) or claims for losses, damages, liabilities, deficiencies, claims, actions, suits, proceedings, judgments, settlements, interest, awards, penalties, fines, costs, or expenses (collectively, "Claims") arising out of the performance of this Agreement, but only in proportion to and to the extent such Claims result from, arise from, or are in any way related to the acts or omissions of the Indemnitor or its affiliates, subsidiaries, successors and assigns, directors, trustees, members, officers, employees, and agents. The Indemnitor shall not be obligated to indemnify the Indemnitee for any Claims to the extent such Claims resulted in whole or in part from the willful misconduct, fraud, or violation of Applicable Laws of the Indemnitee, in each such case as finally determined by an arbitrator under Section 14.3.

(b)    If any insurance coverage maintained by the Indemnifying Party would otherwise cover a liability, loss, expense (including reasonable attorneys' fees) or claim for injury or damages arising out of performance of this Agreement in whole or in part, nothing herein shall be construed to relieve the insurance carrier of its obligations under such coverage, which in all cases shall be primary to the Indemnifying Party's obligations.

10.2    Procedure.

(a)    In the event that any Party hereunder shall receive any notice of any claim or proceeding against it in respect to which indemnity may be sought under Section 10 of this Agreement, the Indemnitee shall give the Party upon whom a claim could be made under this Section 10, the Indemnitor, written notice of such loss, liability, claim, damage, or expense and the Indemnitor shall have the right to contest and defend any action brought against the Indemnitee based thereon, and shall have the right to contest and defend any such action in the name of the Indemnitee at the Indemnitor's own expense; provided, however, that if the Indemnitor shall fail to assume the defense and notify the Indemnitee of the assumption of the defense of any such action within ten (10) days of the giving of such notice by the Indemnitee, then the Indemnitee shall have the right to take any such action as it reasonably deems appropriate to defend, contest, settle, or compromise any such action or assessment and claim indemnification as provided herein; provided, however, that no Party shall settle any such action without the consent of the other applicable Party (which consent shall not be unreasonably withheld) unless such settlement involves only the payment of money and the claimant provides the Indemnitee a release from all liability in respect of such claim. If the Indemnitor defends any action for which  indemnification is claimed, the Indemnitee shall be entitled to participate at its own expense  in the defense of such action; and further, provided, however, that the Indemnitor shall bear the fees and expense of the Indemnitee's counsel only if (i) the engagement of such counsel is specifically authorized in writing by the Indemnitor, (ii) the Indemnitor is not adequately prosecuting the defense in good faith, or (iii) the named parties to such action include both the Indemnitor and the Indemnitee and there exists a conflict or divergence of interest between such parties which renders it inappropriate for counsel selected by the Indemnitor to represent both of such parties. The Indemnitor shall not be liable for any settlement of any claim, action, or proceeding effected without its written consent, except as provided in this Section 10.3. No Party shall recover an amount in excess of the actual damages incurred.

(b)    Notice of all claims as required by Section 10 shall be promptly provided as to (i) the nature of any claim; or (ii) the commencement of any suit or proceeding brought to enforce any claim. In the event of failure to provide such notice or in the event that Indemnitee shall fail to cooperate fully with Indemnitor in the Indemnitor's defense of any suit or proceeding, the Indemnitor shall be released from some or all of its obligations with respect to

**Exhibit A, Page 65**

*15*

that suit or proceeding to the extent that the failure of notice or cooperation actually and materially adversely affected the Indemnitor's defense of such claims.

        10.3   Access to Records.

        (a)   Manager shall provide to the SWMC Board, SWMC's auditors and accountants, SWMC's fiscal intermediaries and accountants and agents for the Medicare and Medicaid programs or any other governmental authority exercising legal and appropriate authority, access to all lawfully required records for a period of four (4) years after the furnishing of services under this Agreement to the extent required under Applicable Laws.

        (b)   Until the expiration of four (4) years after the furnishing of Management Services pursuant to this Agreement, the Parties shall, upon written request, make available to the Secretary of Health and Human Services (the "Secretary" ) or the Comptroller General, or their duly authorized representative(s), contract, books, documents, and records related to this Agreement and necessary to verify the nature and extent of the cost of such Management Services. If any Party carries out any of its obligations under this Agreement by means of a subcontract with a fair market value of $10,000 or more, that Party agrees to include this requirement in any such subcontract. The availability of books, documents, and records shall be subject at all times to all applicable legal requirements, including without limitation such criteria and procedures for seeking and obtaining access that may be promulgated by the Secretary by regulation. Neither Party shall be construed to have waived any applicable attorney-client privilege by virtue of this Section 10.5.

        10.4   Exercise of Right of Access. The foregoing rights of access shall be exercisable through a written request, upon which Manager and its subcontractors shall give access to the above contracts, books, documents, and records from time to time during reasonable business hours.

    **11.**   **Management Fee**.

        11.1   Management Fees. In consideration for the Management Services provided by Manager pursuant to this Agreement and as described in Section 4, the reports to SWMC described in Section 5, and the other functions and obligations of Manager described herein (but excluding corporate Consulting Services described in Section 4.19), SWMC shall pay Manager a monthly management fee (the "Management Fee" ) in the amount of Eighty Thousand Dollars ($80,000) for the first six months hereunder and a monthly management fee of Seventy Thousand Dollars ($70,000) for the second six months hereunder. The Management Fee shall increase annually (twelve months from the Effective Date of this Agreement) based upon the United States published annual inflation rate.   If at the end of the first twelve months of this Agreement, Hospital has $2,000,000 in minimum liquidity (meaning the sum of all cash in any bank accounts of the Hospital), provided the Hospital is fully current on all its accounts payable obligations, Hospital shall pay to Manager a bonus of $200,000.

        11.2   Timing of Payments. Manager shall submit a monthly invoice for the Management Fee to SWMC at least ten (10) days in advance of the end of  each month. Following receipt of the monthly invoice, SWMC shall pay the Management Fee within ten (10) days after the close of the month. Payment for the first month will be prorated accordingly.

**Exhibit A, Page 66**

16

11.3    Arm's Length Transaction. The Parties have negotiated the Management Fee at arm's length and each Party believes that the Management Fee is reasonable and consistent with fair market value and comply with Applicable Laws.

**12.    Breach.** In the event of a breach of any obligation or covenant under this Agreement, other than the obligation to pay money (which shall have a thirty (30) day cure period), the non-breaching Party may give the breaching Party written notice of the specifics of the breach, and the breaching Party shall have sixty (60) days (the "Cure Period") in which to cure the breach; provided, that for any non-monetary defaults reasonably requiring greater than ninety (90) days to cure, the breaching Party shall not be in default so long as the breaching Party commences to cure such default within the required sixty (60) days and diligently prosecutes such cure to completion thereafter. Only if the breach is not cured within said Cure Period shall the non-breaching Party be entitled to pursue any remedies it may have by reason of the breach. A waiver of any breach of this Agreement shall not constitute a waiver of any future breaches of this Agreement, whether of a similar or dissimilar nature.

**13.    Term.**

13.1    Term. Subject to the satisfaction of the conditions specified in Section 13.2, the term of this Agreement ("Term") shall commence and be deemed effective as of the Effective Date, and continue for an initial five (5) year period, and shall automatically renew for an unlimited number of additional one (1) year periods unless a Party provides at least one hundred twenty (120) days prior written notice of nonrenewal to the other Party.

13.2    Conditions to Effectiveness. This Agreement shall become effective only upon satisfaction of the following conditions: (i) execution of this Agreement; and (ii) the provisions of Section 11.3 have been effected.

**14.    Dispute Resolution and Remedies.**

14.1    Resolution by Management. The Parties' respective management teams shall attempt, in good faith, to privately and confidentially resolve any dispute, controversy or claim arising under this Agreement (a "Dispute"). In the event the Parties are unable to resolve the Dispute after negotiating in good faith for thirty (30) days following written notice of the Dispute served on a Party, either Party may refer such Dispute to the SWMC Board or Governing Board of the District.

14.2    Resolution by Consultant. If the parties are unable to resolve the Dispute within twenty (20) days of meeting, then the Dispute shall be referred for resolution to a third-party consultant with expertise in the field of the Dispute (the "Consultant"), the identity of such Consultant to be mutually agreed upon by the parties in good faith.

14.3    Arbitration. If the agreed-upon Consultant is unable to resolve, or propose a correction plan that resolves, the Dispute, in either case to the mutual satisfaction of the Parties, within twenty (20) days after the referral, or the Parties cannot agree on a consultant within twenty (20) days after a request by a Party, then the Dispute shall be settled by binding arbitration, in California, before a single, mutually agreeable arbitrator, in accordance with the JAMS expedited arbitration rules. Each Party covenants to use its commercially reasonable efforts to conclude any arbitration proceeding as expeditiously as reasonably feasible. Each Party shall be responsible for one-half of all costs resulting from initiation of the arbitration

procedure set forth herein; provided, that the arbitrator shall award reasonable costs and attorneys' fees to the prevailing Party or Parties or a claim or counterclaim.

      14.4    <u>Remedies</u>. The arbitrator under Section 14.3 may grant as remedies in connection with an outstanding Dispute: (a) a required Corrective Action Plan for Manager's performance of the Management Services, (b) specific performance of this Agreement, (c) a reduction in the Management Fees payable to Manager, (d) full payment by SWMC to Manager in accordance with the terms hereof, (e) monetary indemnification in accordance with the terms hereof, and/or (f) any other lawful and appropriate remedy, including termination of this Agreement.

      14.5    <u>Exclusive Process</u>. Except as otherwise set forth herein, the procedure set forth in this Section 14 shall be the Parties' exclusive process for resolution of all Disputes; provided, that any Party may seek from any court of competent jurisdiction (a) temporary injunctive relief (but not monetary damages) to prevent imminent harm or danger to the Party or the patients of the Hospital or employees of either Party pending final resolution as described herein, (b) specific performance of a Party's indemnification obligations, or (c) judicial entry of any arbitral award.

    **15.**    **Termination**. This Agreement may be terminated prior to the expiration of the Term only as follows, and any such termination shall not affect any rights or obligations arising prior to the effective date of termination.

      15.1    <u>Termination for Material Breach</u>.

      (a)    In the event of a material breach of this Agreement which is not cured within the Cure Period set forth in Section 12 of this Agreement, the non-breaching Party may terminate this Agreement upon no less than sixty (60) days' advance written notice to the other Party unless the breaching Party has diligently commenced to cure, and has cured the breach, within the prescribed Cure Period; provided, that, in the event the material breach is related to an obligation to pay money, no such advance written notice period shall be required in the event such breach is not cured within the thirty (30) day Cure Period provided in Section 12. This remedy shall be in addition to any other remedy available at law or in equity. Failure to terminate this Agreement shall not waive any breach of this Agreement.

      (b)    Notwithstanding any provision contained herein, however, Manager shall not be liable to SWMC and shall not be deemed to be in breach of this Agreement for the failure to perform any or all obligations to be performed by Manager pursuant to this Agreement, to the extent such failure results from (i) governmental intervention, (ii) labor dispute, (iii) law, regulations, rules or reimbursement rules or policies that actually prevent such performance, (iv) any other action or event which is beyond the reasonable control of Manager, or (v) any failure by SWMC to perform or meet any of SWMC's obligations hereunder; and provided that Manager shall nevertheless be obligated duly to perform hereunder to the extent such performance remains feasible.

      15.2    <u>Termination upon Cessation of Operations</u>." This Agreement shall terminate automatically if the Hospital ceases operations.

      15.3    <u>Bankruptcy or Insolvency</u>. Manager may terminate this Agreement upon fifteen (15) days written notice to SWMC in the event SWMC becomes insolvent or fails to pay, or admits in writing its inability to pay, its debts as they mature; or a trustee, receiver or other

custodian is appointed for SWMC for all or a substantial part its property and is not discharged within sixty (60) days of appointment; or any bankruptcy reorganization, debt, arrangement, or other proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding is instituted by or against SWMC and if instituted against SWMC is consented to or acquiesced in by SWMC or remains undismissed for sixty (60) days following the original filing; or any warrant or attachment is issued against any substantial portion of the property of SWMC which is not released within sixty (60) days of service; and SWMC may likewise terminate if any of the foregoing occurs with regard to Manager and, as a result thereof, substantially impairs Manager's ability to perform its obligations under this Agreement, provided, that, each Party recognizes and acknowledges that enforcement of this Section 15.3 by the non-bankrupt party is subject to the provisions of the automatic stay in bankruptcy in the event of a bankruptcy filing by or against a Party.

15.4    <u>Legal Event; Notice to Amend; Termination</u>. Notwithstanding any other provision of this Agreement, provided that this Agreement is not terminated by Manager or SWMC pursuant to any other provision of this Agreement, if the governmental agencies that administer the Medicare, Medicaid, or other federally funded programs (or their representatives or agents), or any other federal, state or local governmental or non-governmental agency, or any court or administrative tribunal pass, issue, or promulgate any law, rule, regulation, standard, interpretation, order, decision, or judgment, including but not limited to those relating to any regulations pursuant to state or federal anti-kickback or physician self-referral statutes (collectively or individually " Legal Event" ), which, in the written opinion of counsel for either Party (the  "Noticing Party"), (i) makes continued implementation of this Agreement in accordance with its terms unlawful in material respects, or (ii) subjects the Noticing Party to a material risk of prosecution or civil monetary penalty, then the Noticing Party may give the other Party notice of intent to amend this Agreement solely for the purpose of (a) conforming to law and (b)preserving to each Party the economic effects as close to the provisions hereof as is feasible and would yet be lawful. In the event of such notice, the Parties shall have thirty (30) days from the giving of such notice ("Renegotiation Period") within which to attempt to amend this Agreement. If this Agreement is not so amended within the Renegotiation Period to the mutual satisfaction of each Party, this Agreement shall terminate as of midnight on the thirtieth (30th) day after said notice was given.

15.5    <u>Mutual Agreement</u>. This Agreement may be terminated at any time by written agreement of the Parties, under such terms and with such effective date as the Parties may mutually specify. If despite the good faith performance hereunder by the Parties, results of operations at the Hospital decline to such a level that it becomes no longer reasonably feasible for SWMC to operate the Hospital as a viable business, then neither Party hereto will unreasonably withhold mutual consent to termination under this Section 15.5.

15.6    <u>Termination of MSSA</u>. This Agreement shall terminate automatically in the event that the MSSA terminates, subject to the full and complete payment of all compensation due Manager, including Management Fee payments, to the extent any and all such compensation is due to Manager as of the date of any such termination of the MSSA.

15.7    <u>Effects of Termination</u>. The termination of this Agreement for any reason shall be without prejudice to any payments or obligations which may have been earned and accrued or become due to any Party hereunder prior to the date of termination. Notwithstanding anything to the contrary herein, the following provisions shall survive any termination hereof: Section 6 (Access to Records), Section 10 (Defense of Claims, Exculpation), Section 11 (Management Fee), Section 14 (Dispute Resolution and Remedies), Section 17

**Exhibit A, Page 69**

*19*

(Representations and Warranties) and Section 19 (Miscellaneous). Subject to Section 11, in the event this Agreement is terminated for any reason, SWMC shall pay to Manager any unpaid fees as provided herein to the extent any and all such fees are due to Manager as of the date of any such termination.

16. **Representations and Warranties**.

16.1 <u>Manager</u>. As of the Effective Date, Manager represents and warrants to SWMC as follows:

(a) Manager is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and authorized to do business in the State of California.

(b) Manager has full authority to enter into and perform this Agreement, and the signature of Manager's representative at the end hereof signifies that this Agreement has been duly authorized, executed and delivered and represents a legal, valid and binding agreement enforceable against Manager in accordance with its terms (subject only to customary limitations on the enforceability and availability of remedies in accordance with principles of law and equity). Notwithstanding the forgoing, pursuant to the terms of the MSSA, the District Board will have the final authority to approve this Agreement.

(c) The execution, delivery and performance of this Agreement by Manager does not (i) require any consent, waiver, approval, license or authorization of any person or public authority which has not been obtained and is not presently in effect; (ii) to the knowledge of Manager, violate any provision of law applicable to Manager; or (iii) conflict with or result in a default under, or create any lien upon any of the property or assets of Manager under, any agreement or instrument; or (iv) violate any judicial or administrative decree, contract, or other legal obligation to which Manager is subject or by which any of its assets are bound.

(d) There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending or, to Manager's knowledge threatened against Manager that may materially delay or interfere with its entering into and fully and duly performing this Agreement.

(e) Neither Manager nor, to the knowledge of Manager, any Manager personnel (including any Senior Executive) is a person excluded or barred from the Medicare or Medicaid (including Medi-Cal) programs or third-party payer programs.

16.2 <u>SWMC</u>. As of the Effective Date, SWMC represents and warrants to Manager as follows:

(a) SWMC is a nonprofit public benefit corporation, duly organized, validly existing, and in good standing under the laws of the State of California and is a tax-exempt 501(c)(3) organization.

(b) SWMC has full authority to enter into and perform this Agreement, and the signature of SWMC's representative at the end hereof signifies that this Agreement has been duly authorized, executed and delivered and represents a legal, valid and binding agreement enforceable against SWMC in accordance with its terms (subject only to customary

**Exhibit A, Page 70**

20

limitations on the enforceability and availability of remedies in accordance with principles of law and equity). PDHCD in accordance with the MSSA Agreement with SWMC will have the final authority to approve this agreement.

(c)     The execution, delivery and performance of this Agreement by SWMC does not (i) require any consent, waiver, approval, license or authorization of any person or public authority which has not been obtained and is not presently in effect; (ii) violate any provision of law applicable to SWMC; or (iii) conflict with or result in a default under, or create any lien upon any of the property or assets of SWMC under, any agreement or instrument; or (iv) violate any judicial or administrative decree, contract, or other legal obligation to which SWMC is subject or by which any of its assets are bound.

(d)     There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending or, to SWMC's knowledge threatened against SWMC that may materially delay or interfere with its entering into and fully and duly performing this Agreement.

17.     **Definitions**. When used in this Agreement, the following terms shall have the meanings set forth below:

"Accreditation Organization" means any organization engaged in accrediting or certifying the Hospital.

"Affiliate" means, with respect to any specified Person, (a) any other Person directly or indirectly controlled by, controlling or under common control with such specified Person, (b) any executive officer, director, member, manager, managing member or general partner of any such specified Person and (c) with respect to any natural person that qualifies as an Affiliate of a specified Person, also includes any other natural person related to such Affiliate by blood, marriage or adoption not more remote than first cousin or any trust for the benefit of the foregoing natural persons.

"Agreement" means this Management Services Agreement, as amended, restated or modified from time to time.

"Applicable Laws" means (i) all statutes, laws, common law, administrative decisions, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Audited Financial Statements" shall have the same meaning as set forth in Section 5.2.

"Management Fee" shall have the same meaning as set forth in Section 11.1.

"CDPH" means the California Department of Public Health.

"CMS" means the Centers for Medicare & Medicaid Services.

**Exhibit A, Page 71**

21

"Conditions of Participation" means the federal regulations set forth by CMS that govern acute care hospitals and their participation in Medicare, as well as other federally funded programs such as Medicaid .

"Consulting Services" shall have the same meaning as set forth in Section 4.19.

"DHCS" means the California Department of Health Care Services.

"DMHC" means the California Department of Managed Health Care.

"EBIDA" means earnings before interest, depreciation and amortization, excluding all borrowings, donations and subsidy payments from the District.

"Emergency" or "Emergency Services" means Hospital Services required by Applicable Laws, including, but not limited to, the Emergency Medical Treatment and Active Labor Act ("EMTALA"), to be provided to a Person as the result of a medical condition constituting a medical emergency.

"Expenses" shall have the same meaning as set forth in Section 4.17.

"Governing Body" has the meaning set forth in the second recital.

"Government Authority" means any federal, state or local government or other political subdivision thereof, including  CMS, CDPH, DHCS, DMHC and any other Person exercising executive, legislative, judicial, regulatory or administrative powers or functions of government, in each case to the extent the same has jurisdiction over the Person or property in question.

"Hospital Services" means the medical care, products and services provided by the Hospital to the general public, including Emergency Services, and all activities and operations of the Hospital.

"Management Services" shall have the same meaning as set forth in Section 4.1.

"Medicaid" means the means-tested entitlement program under Title XIX of the Social Security Act that provides federal grants to states for medical assistance based on specific eligibility criteria (Social Security Act of 1965, Title XIX; P.L. 89-87, as amended; 42 U.S.C. §§ 1396 et seq.), including the California Medi-Cal Program ("Medi-Cal").

"Medical Staff" shall have the same meaning as set forth in Section 7.1.

"Medicare" means the government-sponsored entitlement program under Title XVIII of the Social Security Act that provides for a health insurance system for eligible elderly and disabled individuals (Social Security Act of 1965, Title XVIII, P.L. 89-87 as amended; 42 U.S.C. §§1395 et seq.).

"Payor" means the Person having responsibility for paying Hospital Claims, or otherwise compensating for Hospital Services, including Medicare, Medicaid, TRICARE, Blue Cross and/or Blue Shield, state government insurers, private insurers and any other Person that maintains a medical or health care benefit program.

"Person" means an individual, corporation, partnership, limited liability company, association, trust, joint venture, unincorporated organization, governmental entity or political subdivision thereof or other entity or group.

"Senior Advisors" shall have the same meaning as set forth in Section 4.2.

"Senior Executives" shall have the same meaning as set forth in Section 4.2.

"SWMC Accounts" shall have the same meaning as set forth in Section 4.16.

"SWMC Personnel" shall have the same meaning as set forth in Section 4.2(c).

"Term" shall have the same meaning as set forth in Section 13 above.

**18.    Miscellaneous.**

18.1    Non-Solicitation. During the Term hereof and for a period of one (1) year after its expiration or termination for any reason, neither Party (and its affiliates, officers, directors employees and agents) shall solicit for employment or contracted services, with any employee of the other Party or its affiliates. In addition, SWMC, on behalf of itself and its affiliates and any person which may acquire all or substantially all of its assets agrees that, until one (1) year subsequent to the termination of this Agreement, it will not solicit or recruit any Senior Executive or other employee of the Manager.

18.2    Public Statements. Manager shall obtain SWMC's prior written consent to any public statements about SWMC, services provided, or its relationship hereunder, and shall refrain from making any such statements unless reasonably consented to by SWMC, provided only that Manager may make any public statements reasonably necessary to comply with law or assert its legal rights in accordance with law and this Agreement.

18.3    Reimbursable Expenses. During the Term, Manager shall be promptly reimbursed upon receipt by SWMC of required documentation for all reasonable expenses (to the extent of and pursuant to SWMC's expense reimbursement policy for other personnel and contractors) incurred by Manager or third parties Manager contracts with in connection with the provision of the Management Services hereunder (e.g., Senior Executives), including , but not limited to transportation, lodging, meals, travel and office expenses upon submission to SWMC of invoices therefore.

18.4    Notices. All notices, requests, demands and  other communications required or permitted to be given pursuant to this Agreement must be in writing and shall be (i) delivered to the appropriate address by hand, by nationally recognized overnight service (costs prepaid); (ii) sent by facsimile or email, or (iii) sent by registered or certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or email addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, email address or person as a Party may designate by notice delivered to the other Party in accordance with this Section 19.4:

>     Durall Capital Holdings, LLC: Aaron Durall
>     5387 N Nob Hill Road
>     Sunrise, FL 33351
>     Email: ald@durallfirm.com

Sonoma West Medical Center Attn: President
501 Petaluma Avenue, Sebastopol, California 95472
Email: Dan.Smith@ehrinternational.com

All notices, requests, demands and other communications shall be deemed have been duly given (as applicable): (A) if delivered by hand, when delivered by hand; (B) if delivered by UPS, Federal Express, OHL or other nationally-recognized overnight delivery service, when delivered by such service; (C) if sent via registered or certified mail, three (3) Business Days after being deposited in the mail, postage prepaid; or (D) if delivered by email or facsimile, when transmitted if transmitted with confirmed delivery.

18.5    Severability. If any clause or provision of this Agreement is determined by a governmental body or a court having jurisdiction thereof to be illegal, invalid, or unenforceable under any present or future law, then the Parties agree that the remaining provisions of this Agreement that reasonably can be given effect apart from the illegal or unenforceable provision shall continue in effect and there shall be substituted for such invalid or unenforceable provision a provision as similar as is feasible and yet would be lawful.

18.6    Expenses. Except as otherwise expressly provided herein, each Party will bear its own legal, accounting, and other fees and expenses relating to the negotiation and preparation of this Agreement and the transactions contemplated hereby.

18.7    Public Announcements. The timing and content of any announcements, press releases, or other public statements concerning this Agreement and the transactions described herein will be determined by a process agreed to by the Parties.

18.8    Entire Agreement. This Agreement (including exhibits and schedules) contain the entire agreement of the Parties with respect to the matters set forth herein and supersede all prior negotiations and agreements, whether oral or written, concerning the subject matter hereof, all of which are merged in this Agreement.

18.9    Captions. The captions or titles of the sections herein have been included for convenience only and shall not be considered as part of this Agreement.

18.10   Counterparts. This Agreement may be signed in counterparts, each of which shall be deemed an original. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

18.11   Force Majeure. If either Party hereto is delayed or hindered in, or prevented from, the performance of any obligation hereunder by reason of fire, strikes, lock-outs, severe weather, rain, earthquakes, other acts of God, labor troubles or shortages, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other reasons of a like nature not the fault of the Party delayed in performing work or doing acts required under the terms of this Agreement (all of such reasons or causes referred to in this Agreement as "Force Majeure"), then performance of such acts shall be excused to the extent it is not possible, and for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, that during such interregnum, the Party so impeded shall continue in good faith to perform to the full extent that remains reasonably feasible. If substantial nonperformance

**Exhibit A, Page 74**

24

continues for more than one hundred twenty (120) days, the Party so harmed may terminate upon thirty (30) days written notice.

18.12 Consents. Whenever under this Agreement provision is made for either Party's securing the consent or approval of the other, such consent or approval shall be in writing and (except as otherwise provided herein) shall not be unreasonably withheld, delayed, or conditioned.

18.13 Binding Effect; Assignment. This Agreement is binding on and is for the benefit of SWMC and Manager and their successors, assigns, and legal representatives. No Party shall assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Party; provided, that, Manager may (upon written notice to SWMC) assign this Agreement to an affiliate of Manager, and/or to subcontract with any other parties in order to comply with and perform certain of its obligations hereunder, provided that Manager shall (a) adequately inform such subcontractors of their obligations hereunder, (b) ensure that they fully comply herewith, and (c) remain fully responsible for the performance of any such affiliate and/or subcontractor in accordance with all Applicable Laws.

18.14 Governing Law. This Agreement shall be governed and construed according to the laws of California, without giving effect to any choice or conflict of law provision or rule thereof.

18.15 Further Assurance. Each Party agrees to execute and deliver to the other such additional instruments, certificates, and documents as the requesting Party may reasonably request in order to assist the requesting Party in obtaining the rights and benefits to which such Party is entitled hereunder.

18.16 Third-Party Beneficiaries. The Manager Indemnified Persons and SWMC Indemnified Persons are express third party beneficiaries of Section 11 hereof. The Senior Executives are express third party beneficiaries of the provisions of this Agreement that relate to them. The District is a third party beneficiary of this Agreement.

18.17 Performance Data. Manager shall have rights to all performance data for the Hospital relating to the period following the Effective Date (including prior data for comparative purposes) through the Term hereof, for use as Manager deems appropriate in its sole discretion.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**SONOMA WEST MEDICAL CENTER**

By: _____

Its:

**Exhibit A, Page 75**

*25*

DURALL CAPITAL HOLDINGS, LLC

By: _____

Its:

EXHIBIT A

BUSINESS ASSOCIATE AGREEMENT

## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT (the "BA Agreement") is hereby entered between Sonoma West Medical Center (the "Covered Entity") and Durall Capital Holdings, LLC, (the "Business Associate") in order for the Covered Entity to disclose Protected Health Information to the Business Associate in connection with services or products provided to or for Covered Entity, or as otherwise required by the Health Insurance Portability and Accountability Act of 1996, as amended, ("HIPAA"). The Covered Entity and Business Associate agree to the following terms and conditions, which are intended to comply with HIPAA; the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"); and, rules promulgated pursuant to such laws:

### 1. General Terms and Conditions

(a) "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. part 160 and subparts A and E of part 164.

(b) "Security Rule" shall mean the Standards for Security of Individually Identifiable Health Information at 45 C.F.R. part 160 and subparts A and C of part 164.

(c) Capitalized terms used but not otherwise defined in this BA Agreement shall have the same meaning as those terms in the Privacy Rule and Security Rule, including 45 CFR §§160.103 and 164.501.

### 2. Obligations and Activities of Business Associate

(a) Business Associate agrees to not use or disclose Covered Entity's Protected Health Information other than as permitted or required by this BA Agreement or applicable law.

(b) Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Covered Entity's Protected Health Information other than as provided for by this BA Agreement.

(c) Business Associate agrees to report to Covered Entity's Privacy Official, within five (5) business days, any use or disclosure of Covered Entity's Protected Health Information not provided for by this BA Agreement, including the identification of each Individual whose unsecured Protected Health Information has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, or disclosed in a noncompliant manner (a "breach").

(d) Business Associate agrees to ensure that any agent or subcontractor to whom it provides Covered Entity's Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity, agrees to

1

13521325.2

**Exhibit A, Page 78**

*28*

the same restrictions and conditions that apply through this BA Agreement to Business Associate with respect to such information.

(e) To the extent Business Associate has Covered Entity's Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, to Protected Health Information in a Designated Record Set, for Covered Entity in order to meet the requirements of 45 C.F.R. § 164.524, including provision of records in electronic form to the extent required by the HITECH Act.

(f) Business Associate agrees to make any amendment(s) to Protected Health Information in its possession contained in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 C.F.R. § 164.526 at the request of Covered Entity.

(g) Business Associate agrees to make its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity, available to the Secretary of Health and Human Services, in a time and manner designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(h) Business Associate agrees to document all disclosures of Covered Entity's Protected Health Information in its possession and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528, and the HITECH Act.

(i) Business Associate agrees to provide to Covered Entity information collected in accordance with Section 2(h) of this BA Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528, and the HITECH Act.

(j) Business Associate agrees to, subject to subsection 4(c) below, return to the Covered Entity or destroy, within fifteen (15) days of the termination of this Agreement, the Covered Entity's Protected Health Information in its possession and retain no copies.

(k) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to either party, of a use or disclosure of Covered Entity's Protected Health Information in violation of this BA Agreement or applicable law.

(l) Business Associate agrees to indemnify, insure, defend and hold harmless Covered Entity and Covered Entity's employees, directors, officers, subcontractors, agents, or members of its workforce, each of the foregoing hereinafter referred to as an "indemnified party," against all actual and direct

2

13521325.2

29

losses suffered by the indemnified party and all liability to Individuals arising from or in connection with any breach of this BA Agreement or of any warranty hereunder or from any negligence, wrongful acts, or omissions, including the failure to perform its obligations under HIPAA, as well as the additional obligations under the HITECH Act, by Business Associate or its employees, directors, officers, subcontractors, agents, or members of its workforce. This includes, but is not limited to, expenses associated with notification to Individuals and/or the media in the event of a breach of Protected Health Information held by Business Associate. Accordingly, on demand, Business Associate shall reimburse any indemnified party for any and all actual and direct losses, liabilities, lost profits, fines, penalties, costs or expenses (including reasonable attorneys' fees) which may for any reason be imposed upon any indemnified party by reason of any suit, claim, action, proceeding or demand by any Individual which results from the indemnifying party's breach hereunder. The provisions of this paragraph shall survive the expiration or termination of this BA Agreement for any reason.

(m) In addition to its overall obligations with respect to Protected Health Information, to the extent required by the Security Rule, Business Associate will:

> (i) Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Covered Entity's electronic Protected Health Information ("EPHI") that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by HIPAA;

> (ii) Ensure that any agent or subcontractor to whom it provides such EPHI agrees to implement reasonable and appropriate safeguards to protect the EPHI; and

> (iii) Report to Covered Entity any Security Incident upon discovery.

(n) Except as otherwise allowed in this BA Agreement, HIPAA, and the HITECH Act, Business Associate shall not directly or indirectly receive remuneration in exchange for any Protected Health Information of an Individual unless the Individual has provided a valid, HIPAA-compliant authorization.

(o) Business Associate shall use and disclose only the minimum necessary Protected Health Information to accomplish the intended purpose of such use, disclosure or request, as applicable. Prior to any use or disclosure, Business Associate shall determine whether a Limited Data Set would be sufficient for these purposes.

(p) Covered Entity, in its sole and absolute discretion, may elect to delegate to Business Associate the requirement under HIPAA, and the HITECH Act, to notify affected Individuals of a breach of unsecured Protected Health Information if such breach results from, or is related to, an act or omission of Business

3

13521325.2

**Exhibit A, Page 80**

30

Associate or the agents or representatives of Business Associate. If Covered Entity elects to make such delegation, Business Associate shall perform such notifications and any other reasonable remediation services (i) at Business Associate's sole cost and expense, and (ii) in compliance with all applicable laws including HIPAA, and the HITECH Act. Business Associate shall also provide Covered Entity with the opportunity, in advance, to review and approve of the form and content of any breach notification that Business Associate provides to Individuals.

(q) Pursuant to the Security Rule, Business Associate agrees to comply with the following:

(i) Sections 164.308 (administrative safeguards), 164.310 (physical safeguards), 164.312 (technical safeguards) and 164.316 (policies and procedures and documentation requirements) of the Security Rule shall apply to Business Associate in the same manner that such sections apply to Covered Entity. The additional requirements of the HITECH Act that relate to security and that are made applicable with respect to covered entities shall also be applicable to Business Associate and shall be and by this reference hereby are incorporated into this BA Agreement.

(ii) Unless Covered Entity agrees, in writing, that this requirement is infeasible with respect to particular data, Business Associate shall secure all Protected Health Information by a technology standard that renders Protected Health Information unusable, unreadable, or indecipherable to unauthorized individuals and is developed or endorsed by a standards developing organization that is accredited by the American National Standards Institute and is consistent with guidance issued by the Secretary of Health and Human Services specifying the technologies and methodologies that render Protected Health Information unusable, unreadable, or indecipherable to unauthorized persons, including the use of standards developed under § 3002(b)(2)(B)(vi) of the Public Health Service Act, as added by the HITECH Act.

(iii)     Business Associate may use and disclose Protected Health Information that Business Associate obtains or creates only if such use or disclosure, respectively, is in compliance with each applicable requirement of § 164.504(e) of the Privacy Rule, relating to business associate contracts. The additional requirements of Subtitle D of the HITECH Act that relate to privacy and that are made applicable with respect to Covered Entity shall also be applicable to Business Associate and shall be and by this reference hereby are incorporated into this BA Agreement.

(iv)     In accordance with § 164.504(e)(1)(ii) of the Privacy Rule, each party agrees that, if it knows of a pattern of activity or practice of the other party that constitutes a material breach or violation of the other party's obligation under the BA Agreement, the non-breaching party will take

4

reasonable steps to cure the breach or end the violation, as applicable, and, if such steps are unsuccessful, terminate the contract or arrangement, if feasible, or if termination is not feasible, report the problem to the Secretary of Health and Human Services.

(r) To the extent that Business Associate is to carry out Covered Entity's obligations under the Privacy Rule or the Security Rule, Business Associate will comply with any Privacy or Security Rule requirements that apply to Covered Entity in its performance of the obligation.

## 3. Permitted Uses and Disclosures of Protected Health Information by Business Associate

(a) General Use and Disclosure Provisions.  Except as otherwise limited in this BA Agreement, Business Associate may use or disclose Protected Health Information obtained from or on behalf of Covered Entity to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in this BA Agreement, provided that such use or disclosure complies with HIPAA. Business Associate acknowledges and agrees that it acquires no title or rights to the Protected Health Information, including any de-identified information, as a result of this BA Agreement.

(b) Specific Use and Disclosure Provisions.

(i) Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity and fulfill its obligations under any underlying agreement with Covered Entity, provided that such use or disclosure would not violate the Privacy Rule or Security Rule if done by the Covered Entity.

(ii) Business Associate may use and disclose Protected Health Information for the proper and necessary management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that, as to any such disclosure:

(A) the disclosure is Required By Law; or

(B) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies Business Associate of any confidentiality breaches.

(iii) Except as otherwise limited in this BA Agreement, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity, relating to the health care operations of Covered Entity.

5

13521325.2

**Exhibit A, Page 82**

*32*

### 4. Survival and Termination

(a) Survival. Business Associate's obligations under this BA Agreement shall survive the termination of this BA Agreement and shall end when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity. If it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b) Termination for Cause. Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall provide written notice to Business Associate and may terminate this BA Agreement and any underlying agreement with Business Associate if Business Associate does not cure the breach or end the violation within 30 days of such notice.

(c) Effect of Termination

    (i) Except as provided below in paragraph 4(c)(ii) of this BA Agreement, upon termination of this Agreement, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

    (ii) In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity written notification of the conditions that make return or destruction infeasible, and, if Covered Entity determines that return or destruction is infeasible, Business Associate shall extend the protections of this BA Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information. If it is infeasible for Business Associate to obtain, from a subcontractor or agent, any Protected Health Information in the possession of the subcontractor or agent, Business Associate must provide a written explanation to Covered Entity and require the subcontractors and agents to agree in writing to extend any and all protections, limitations and restrictions contained in this BA Agreement to the subcontractors' and/or agents' use and/or disclosure of any Protected Health Information retained after the termination of this BA Agreement, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the Protected Health Information infeasible.

13521325.2

**Exhibit A, Page 83**

_33_

### 5. Interpretation and Amendment of this BA Agreement

To the degree the terms of this BA Agreement conflict with the terms of any underlying contract, the terms of this BA Agreement shall control. A reference in this BA Agreement to a section of the Privacy Rule means the section as in effect or as amended. Any ambiguity or inconsistency in this BA Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy Rule, the Security Rule, and the HITECH Act. The parties hereto agree to negotiate in good faith to amend this BA Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule, and HIPAA, and for Business Associate to provide services to Covered Entity. However, no change, amendment, or modification of this BA Agreement shall be valid unless it is set forth in writing and agreed to by both parties.

### 6. No Third Party Rights/Independent Contractors

The parties to this BA Agreement do not intend to create any rights in any third parties other than the parties. No patient whose confidential medical records may have been subject to an unintended disclosure of breach by any party shall have any rights or remedies under this BA Agreement. The parties agree that they are independent contractors and not agents of each other.

### 7. Notices

Any notice required or permitted by this BA Agreement to be given or delivered shall be in writing and shall be deemed given or delivered if delivered in person, or sent by courier or expedited delivery service, or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile (if confirmed). Each party may change its address for purposes of this BA Agreement by written notice to the other party.

      WHEREFORE, the parties have executed this BA Agreement, effective as of the last signature date below.

Covered Entity:  Sonoma West Medical Center

Signature: _____    Date: _____
Printed Name: _____
Title: _____

Business Associate:  Durall Capital Holdings, LLC

Signature: _____    Date: _____
Printed Name: _____
Title: _____

7

13521325.2

_34_

**Exhibit A, Page 84**

## LABORATORY MANAGEMENT SERVICES AGREEMENT

This LABORATORY MANAGEMENT SERVICES AGREEMENT ("Agreement") is made and entered into to be effective as of the last dated signature below (the "Effective Date") by and between Sonoma West Medical Center, a California nonprofit public benefit corporation that operates a licensed acute care hospital in Sebastopol, California (the "Hospital") and Durall Capital Holdings, LLC ("Durall"), a Florida limited liability company.

## RECITALS

WHEREAS, the Hospital desires to provide clinical laboratory toxicology testing (the "Testing") for its non-patients (defined as those patients whose only contact with the hospital is the accessioning of their specimens for Testing), and;

WHEREAS, Durall is a company that specializes in the management of clinical laboratory Testing for the non-patients of hospitals such as Hospital, and;

WHEREAS, the Hospital desires that Durall manage the Hospital's Testing for its non-patients, and;

WHEREAS, Durall desires to provide the management for the Testing of the Hospital's non-patients, and;

WHEREAS, the Hospital intends to provide toxicology analysis Testing services for its non-patients, and;

WHEREAS, Durall intends to manage the Hospital's toxicology analysis Testing services for the Hospital's non-patients, and;

WHEREAS, Durall intends to have an independent clinical reference laboratory provide toxicology confirmation Testing services for the Hospital's non-patients.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and conditions of this Agreement, the value of which is stipulated, the parties hereby agree as follows:

## 1. RESPONSIBILITIES OF DURALL

1.1 Durall shall exclusively manage all applicable and necessary Testing for Hospital's non-patients.

1.2 Durall shall provide for a third-party clinical reference laboratory to provide confirmation Testing for Hospital's non-patients.

13521307.3

**Exhibit A, Page 85**

*35*

1.3    Durall shall ensure the timely provision of a comprehensive clinical report to the physician or non-physician practitioner who ordered the Testing.

1.4    Durall shall manage Hospital's computer software interface(s) to allow Hospital personnel to upload appropriate physician or non-physician practitioner orders for Testing, as well as applicable patient demographics for the purposes of specimen accessioning and billing for the Testing from the third-party clinical reference laboratory.

1.5    Durall shall comply with all Hospital's reasonable and customary policies and procedures, to include patient record, patient privacy, and operational and financial requirements.

1.6    Durall expressly agrees that it shall not provide any financial incentive to any physician or non-physician practitioner for the physician's or practitioner's ordering of Testing, either directly or indirectly, in any manner whatsoever.

1.7    Durall and all its principals, officers, employees and agents shall comply with all applicable California and federal statutes, rules and regulations regarding the Testing, to include CLIA (Clinical Laboratory Improvement Act), HIPAA (Health Insurance Portability and Accountability Act), licensure, accreditation, and anti-kickback and anti-self-referral provisions.

1.8    Durall warrants and guarantees that neither it nor any of its principals, officers, employees, or agents are excluded from any federal health care program.

## 2.    RESPONSIBILITIES OF THE HOSPITAL

2.1    The Hospital shall provide clinical staff for the non-patient specimen accessioning, quality assurance, analysis Testing, and shipping of specimens for confirmation Testing services to the third-party clinical reference laboratory, by means of a Hospital contracted worker(s) or employee(s) on-site at the third-party clinical reference laboratory.

2.2    The Hospital shall ensure that all physicians and mid-level providers ordering Testing pursuant to this Agreement obtain and maintain adequate authorization, whether as to the Hospital's medical staff bylaws and/or California law, to order the Testing for the Hospital's non-patients.

2.3    The Hospital shall require the ordering physicians to provide the Hospital medical necessity documentation for Testing.

2.4    The Hospital shall be responsible for the coding, billing and collections for all Testing, within all applicable guidelines and requirements. The Hospital agrees that its coding and billing protocols shall adhere to Durall's compliance policies.

2

13521307.3

**Exhibit A, Page 86**

36

2.5     The Hospital shall be responsible for compliance with all third-party payer protocols and requirements, to include the compliant completion and submission of UB-04 (the CMS Form 1450) claims.

2.6     The Hospital shall make all reasonable and customary efforts to collect all applicable Testing payments, including insurance payments from third-party payers and all deductibles, co-insurances, or other financial obligations.

2.7     The Hospital shall pay Durall for its management of the Testing pursuant to the attached Schedule A and payment policies as contained within this Agreement.

2.8     The Hospital shall be entitled to retain all collections for the Testing, net of the payments set out in Sections 2.7 and 4.1.

2.9     The Hospital shall submit claims for Testing reimbursement to the applicable third-party commercial insurance payer.

2.10    The Hospital is solely responsible for setting its own charges for Testing, though Durall shall offer advice and assistance upon Hospital's request.

2.11    The Hospital expressly agrees that it shall not provide any financial incentive to any physician or non-physician practitioner for the physician's or non-physician practitioner's ordering of Testing, and alternatively, will not provide for any form of financial disincentive as to any physicians or other practitioners who do not order Testing.

2.12    The Hospital shall permit access by Durall to patient and billing records relating to the Testing, subject to federal and state confidentiality laws.

2.13    The Hospital shall provide for the Testing without discrimination on the basis of gender, race, color, age, religion, national origin, mental or physical disability, or any other grounds prohibited by law.

2.14    The Hospital and all its principals, officers, employees and agents shall comply with all applicable California and federal statutes, rules and regulations regarding the Testing, to include CLIA (Clinical Laboratory Improvement Act), HIPAA (Health Insurance Portability and Accountability Act), licensure, accreditation, and anti-kickback and anti-self-referral provisions.

2.15    The Hospital warrants and guarantees that neither it nor any of its principals, officers, employees, or agents are excluded from any federal health care program.

2.16    The Hospital shall be responsible for determining insurance pre-authorizations to ensure coverage by the applicable third-party payer plan(s).

13521307.3

**Exhibit A, Page 87**

_37_

3.    TERM AND TERMINATION

3.1    This Agreement shall be for a term of one (1) year, and shall automatically renew for successive one (1) year terms unless or until terminated as provided in Section 3.2 or 3.3.

3.2    In the event either party shall materially fail to comply with any provision specified in this Agreement, and such breach is not cured within thirty (30) calendar days of the receipt by the party in breach of written notice of such breach, then the notifying party shall have the right, in addition to any other rights it may have, to terminate this Agreement immediately. Termination for breach does not relieve the breaching party of any payment obligations it has under this Agreement.

3.3    Either party may terminate this Agreement without cause upon ninety (90) days' prior written notice.

4.    COMPENSATION

4.1    The Hospital agrees to pay and Durall agrees to accept as full payment for the services provided under this Agreement the payment set forth in Schedule A of this Agreement.

4.2    Durall shall invoice the Hospital monthly, and the Hospital's payment of the invoices is due within thirty (30) days of the Hospital's receipt of such invoices. Payments that are fifteen (15) or more days late, shall bear an additional interest charge of one percent (1%) per month, or the maximum amount of interest permitted under California law, whichever is greater.

5.    RELATIONSHIP OF THE PARTIES

5.1    It is understood and agreed that the Hospital and Durall are, and at all times shall be, independent contractors of one another. Neither shall have nor exercise any control or direction over the professional judgment of any personnel of the other, nor over the methods or manner by which such personnel perform services as they relate to the handling of patient specimens, accessioning, laboratory operations, coding, billing, or collections, except as expressly set forth in this Agreement.

5.2    Hospital and Durall agree that Testing ordered by physicians or non-physician practitioners that are not members of the Hospital medical staff will be afforded the same quality assurance as any patient specimen Testing ordered by Hospital medical staff. Hospital shall not discriminate against any patient or ordering physician/non-physician practitioner for any Testing for any patient that is not a patient of the Hospital, and Hospital will code and bill such claim with the same diligence as the claims for payment for Testing of the Hospital's inpatients and outpatients.

13521307.3

38

6.    CONFIDENTIALITY OF PROPRIETARY INFORMATION

6.1    Except as required by law, each party, during the term of this Agreement and following termination of this Agreement, shall strictly maintain the confidentiality of any proprietary information including, but not limited to, trade secrets of the other party. All information which the parties have a reasonable basis to consider as proprietary information, or which is reasonably treated by any party as being proprietary, shall be presumed to be proprietary. Each party shall take necessary and reasonable precautions to prevent unauthorized disclosure of proprietary information or patient medical information and shall require all of its officers, employees and other personnel to whom it is necessary to disclose the same, or to whom the same has been disclosed, to keep such proprietary information confidential. Upon termination of this Agreement, each party agrees to return to the other all proprietary information of the other party in such party's possession including, without limitation, any documentation evidencing the Hospital's or Durall's policies, procedures, clinical protocols, and all intellectual property related to the performance of the Testing. In the event that any policies, procedures, protocols, or information systems be developed exclusively for or by the Hospital, they shall remain the property of the Hospital after the termination of this Agreement.

7.    BUSINESS ASSOCIATE PROVISIONS

7.1    In the performance of the Testing under this Agreement, the Hospital and Durall may be required to share or disclose to each other and/or Durall may come into possession of certain business, financial or clinical information that may be protected by federal, state and local laws and regulations regarding the privacy, security and/or privilege of medical/health information, including federal privacy and security regulations promulgated under HIPAA. The parties shall implement appropriate safeguards to prevent the unlawful use or disclosure of patient protected heath information, to include the entering of a separate HIPAA Business Associate Agreement.

8.    INDEMNIFICATION AND LIABILITY INSURANCE

8.1    The Hospital shall indemnify and hold Durall harmless from any third-party liability accruing from any act or failure to act of Hospital pursuant to this Agreement. Durall shall indemnify and hold the Hospital harmless from any third-party liability accruing from any act or failure to act of Durall pursuant to this Agreement.

8.2    The Hospital and Durall shall carry professional liability insurance having minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, or as the parties may otherwise mutually agree.

13521307.3

**Exhibit A, Page 89**

*39*

## 9.    GENERAL PROVISIONS

9.1    <u>Notices</u>. Notices or communications to be given under this Agreement shall be given to the respective parties in writing either by personal delivery, overnight delivery service or registered or certified mail, postage prepaid as follows:

To:    Sonoma West Medical Center      To:    Durall Capital Holdings, LLC
        501 Petaluma Avenue                    5387 N. Nob Hill Road
        Sebastopol, CA 95472                    Sunrise, FL 33351

9.2    <u>Assignment</u>.   In the case of a name change by the Hospital or a merger/acquisition including the Hospital, this Agreement may be assigned to the newly named/formed entity. The Hospital will provide Durall with the new name or the newly formed Hospital name and signatures of authorized representatives of the successor Hospital. Assignment under other circumstances may occur only upon the prior written approval of all parties. This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, successors, legal representatives, and permitted assigns.

9.3    <u>Waiver</u>. Delay or non-enforcement of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any provision of this Agreement. None of the provisions of this Agreement shall be considered waived by either party except when such waiver is given in writing.

9.4    <u>Access to Records</u>. Each party shall keep, and allow the other party reasonable access to, full and accurate books and records of all services rendered hereunder. Further, to the extent required by 42 USC section 1395x(v)(1)(I), until the expiration of four (4) years after the termination of this Agreement, each party shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services, or to the Comptroller General of the United States General Accounting Office, or to any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to certify the nature and extent of the costs of the services provided under this Agreement.

9.5    <u>Entire Agreement; Amendment</u>. This Agreement constitutes the entire agreement between the parties and supersedes all prior or contemporaneous discussions or agreements. This Agreement may be modified only in writing duly executed by both parties.

9.6    <u>Severability</u>. If any term or provision of this Agreement is held invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

9.7    <u>Cooperation</u>. In the event of any litigation against either party pertaining to any matter relating to this Agreement, both parties agree to fully cooperate with the other at all times during the pendency of the claim or lawsuit

6

13521307.3

40

including, without limitation, providing the other with all available information, including patient records (to the extent permitted by applicable law).

9.8    Counterparts. This Agreement may be executed in one or more counterparts each of which may be deemed an original, but all of which constitute one and the same instrument.

9.9    Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to conflicts of laws or choice of laws rules. All legal actions relating to this Agreement shall be brought in the state courts in Sonoma County, California, or, if brought in federal court, in the United States District Court, Northern District of California, in Sonoma County, if possible, or in San Francisco or Oakland. The Parties agree, however, that if Durall files suit against Hospital for non-payment under this Agreement, Durall may do so in Florida. It is further agreed that in the case of legal dispute decided in a court of law that the prevailing party awarded a judgment against the other party by the court shall have rights to recover reasonable attorney fees.

9.10   Confidentiality. Each party agrees to keep this Agreement and its contents confidential and not to disclose this Agreement or its contents to any third party other than its legal and financial advisors and appropriate facility personnel, or otherwise as required by law, without the consent of the other party.

9.11   Agreement Subject to State and Federal Law. The parties recognize that this Agreement at all times is subject to applicable federal, state and local law, including, but not limited to the Social Security Act and the rules and regulations and policies of the State of California. The parties further recognize that this Agreement shall be subject to amendments of such laws and regulations, and to new legislation such as a new federal or state health insurance program. Any provisions of law that invalidate, or otherwise are inconsistent with the terms of this Agreement, or that would cause one or both the parties to be in violation of applicable laws, shall be deemed to have superseded the terms of this Agreement, provided however that the parties shall exercise their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable laws and regulations.

9.12   Fraud and Abuse Laws. The parties shall strictly comply with applicable federal, state, and local law including the anti-kickback and anti-self-referral laws. The parties agree that the payments provided for in this Agreement are consistent with the fair market value for the services provided, negotiated at arms' length, and are entirely unrelated to any volume or value of patients or patient business that is subject to reimbursement by a government health insurance plan. Hospital understands that Durall may or may not utilize one or more third-party marketing companies that promote(s) the services of Durall and/or the Hospital to physicians and non-physician practitioners pursuant to this Agreement. Durall will ensure that such marketing arrangements are compliant with federal and state anti-kickback laws pursuant to Health and Human Services Office of Inspector General

13521307.3

4/1

Advisory Opinion 98-10, and other relevant legal authority.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the last date of signature below.

**Durall Capital Holdings, LLC**       **Sonoma West Medical Center**

_____       _____
Signature                             Signature

Printed Name: _____         Printed Name: _____

Date: _____         Date: _____

8

13521307.3

4/2

## Schedule A

Compensation:

$150,000 per month

9

**Exhibit A, Page 93**

4/3

## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT (the "BA Agreement") is hereby entered between Sonoma West Medical Center (the "Covered Entity") and Reliance Laboratory Testing, Inc., (the "Business Associate") in order for the Covered Entity to disclose Protected Health Information to the Business Associate in connection with services or products provided to or for Covered Entity, or as otherwise required by the Health Insurance Portability and Accountability Act of 1996, as amended, ("HIPAA").  The Covered Entity and Business Associate agree to the following terms and conditions, which are intended to comply with HIPAA; the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"); and, rules promulgated pursuant to such laws:

## 1. General Terms and Conditions

(a) "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. part 160 and subparts A and E of part 164.

(b) "Security Rule" shall mean the Standards for Security of Individually Identifiable Health Information at 45 C.F.R. part 160 and subparts A and C of part 164.

(c) Capitalized terms used but not otherwise defined in this BA Agreement shall have the same meaning as those terms in the Privacy Rule and Security Rule, including 45 CFR §§160.103 and 164.501.

## 2. Obligations and Activities of Business Associate

(a) Business Associate agrees to not use or disclose Covered Entity's Protected Health Information other than as permitted or required by this BA Agreement or applicable law.

(b) Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Covered Entity's Protected Health Information other than as provided for by this BA Agreement.

(c) Business Associate agrees to report to Covered Entity's Privacy Official, within five (5) business days, any use or disclosure of Covered Entity's Protected Health Information not provided for by this BA Agreement, including the identification of each Individual whose unsecured Protected Health Information has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, or disclosed in a noncompliant manner (a "breach").

(d) Business Associate agrees to ensure that any agent or subcontractor to whom it provides Covered Entity's Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity, agrees to

1

13563529.1

the same restrictions and conditions that apply through this BA Agreement to Business Associate with respect to such information.

(e) To the extent Business Associate has Covered Entity's Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, to Protected Health Information in a Designated Record Set, for Covered Entity in order to meet the requirements of 45 C.F.R. § 164.524, including provision of records in electronic form to the extent required by the HITECH Act.

(f) Business Associate agrees to make any amendment(s) to Protected Health Information in its possession contained in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 C.F.R. § 164.526 at the request of Covered Entity.

(g) Business Associate agrees to make its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity, available to the Secretary of Health and Human Services, in a time and manner designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(h) Business Associate agrees to document all disclosures of Covered Entity's Protected Health Information in its possession and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528, and the HITECH Act.

(i) Business Associate agrees to provide to Covered Entity information collected in accordance with Section 2(h) of this BA Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528, and the HITECH Act.

(j) Business Associate agrees to, subject to subsection 4(c) below, return to the Covered Entity or destroy, within fifteen (15) days of the termination of this Agreement, the Covered Entity's Protected Health Information in its possession and retain no copies.

(k) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to either party, of a use or disclosure of Covered Entity's Protected Health Information in violation of this BA Agreement or applicable law.

(l) Business Associate agrees to indemnify, insure, defend and hold harmless Covered Entity and Covered Entity's employees, directors, officers, subcontractors, agents, or members of its workforce, each of the foregoing hereinafter referred to as an "indemnified party," against all actual and direct

2

losses suffered by the indemnified party and all liability to Individuals arising from or in connection with any breach of this BA Agreement or of any warranty hereunder or from any negligence, wrongful acts, or omissions, including the failure to perform its obligations under HIPAA, as well as the additional obligations under the HITECH Act, by Business Associate or its employees, directors, officers, subcontractors, agents, or members of its workforce. This includes, but is not limited to, expenses associated with notification to Individuals and/or the media in the event of a breach of Protected Health Information held by Business Associate. Accordingly, on demand, Business Associate shall reimburse any indemnified party for any and all actual and direct losses, liabilities, lost profits, fines, penalties, costs or expenses (including reasonable attorneys' fees) which may for any reason be imposed upon any indemnified party by reason of any suit, claim, action, proceeding or demand by any Individual which results from the indemnifying party's breach hereunder. The provisions of this paragraph shall survive the expiration or termination of this BA Agreement for any reason.

(m) In addition to its overall obligations with respect to Protected Health Information, to the extent required by the Security Rule, Business Associate will:

    (i) Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Covered Entity's electronic Protected Health Information ("EPHI") that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by HIPAA;

    (ii) Ensure that any agent or subcontractor to whom it provides such EPHI agrees to implement reasonable and appropriate safeguards to protect the EPHI; and

    (iii) Report to Covered Entity any Security Incident upon discovery.

(n) Except as otherwise allowed in this BA Agreement, HIPAA, and the HITECH Act, Business Associate shall not directly or indirectly receive remuneration in exchange for any Protected Health Information of an Individual unless the Individual has provided a valid, HIPAA-compliant authorization.

(o) Business Associate shall use and disclose only the minimum necessary Protected Health Information to accomplish the intended purpose of such use, disclosure or request, as applicable. Prior to any use or disclosure, Business Associate shall determine whether a Limited Data Set would be sufficient for these purposes.

(p) Covered Entity, in its sole and absolute discretion, may elect to delegate to Business Associate the requirement under HIPAA, and the HITECH Act, to notify affected Individuals of a breach of unsecured Protected Health Information if such breach results from, or is related to, an act or omission of Business

3

13563529.1

46

Associate or the agents or representatives of Business Associate. If Covered Entity elects to make such delegation, Business Associate shall perform such notifications and any other reasonable remediation services (i) at Business Associate's sole cost and expense, and (ii) in compliance with all applicable laws including HIPAA, and the HITECH Act. Business Associate shall also provide Covered Entity with the opportunity, in advance, to review and approve of the form and content of any breach notification that Business Associate provides to Individuals.

(q) Pursuant to the Security Rule, Business Associate agrees to comply with the following:

(i) Sections 164.308 (administrative safeguards), 164.310 (physical safeguards), 164.312 (technical safeguards) and 164.316 (policies and procedures and documentation requirements) of the Security Rule shall apply to Business Associate in the same manner that such sections apply to Covered Entity. The additional requirements of the HITECH Act that relate to security and that are made applicable with respect to covered entities shall also be applicable to Business Associate and shall be and by this reference hereby are incorporated into this BA Agreement.

(ii) Unless Covered Entity agrees, in writing, that this requirement is infeasible with respect to particular data, Business Associate shall secure all Protected Health Information by a technology standard that renders Protected Health Information unusable, unreadable, or indecipherable to unauthorized individuals and is developed or endorsed by a standards developing organization that is accredited by the American National Standards Institute and is consistent with guidance issued by the Secretary of Health and Human Services specifying the technologies and methodologies that render Protected Health Information unusable, unreadable, or indecipherable to unauthorized persons, including the use of standards developed under § 3002(b)(2)(B)(vi) of the Public Health Service Act, as added by the HITECH Act.

(iii)      Business Associate may use and disclose Protected Health Information that Business Associate obtains or creates only if such use or disclosure, respectively, is in compliance with each applicable requirement of § 164.504(e) of the Privacy Rule, relating to business associate contracts. The additional requirements of Subtitle D of the HITECH Act that relate to privacy and that are made applicable with respect to Covered Entity shall also be applicable to Business Associate and shall be and by this reference hereby are incorporated into this BA Agreement.

(iv)      In accordance with § 164.504(e)(1)(ii) of the Privacy Rule, each party agrees that, if it knows of a pattern of activity or practice of the other party that constitutes a material breach or violation of the other party's obligation under the BA Agreement, the non-breaching party will take

4

reasonable steps to cure the breach or end the violation, as applicable, and, if such steps are unsuccessful, terminate the contract or arrangement, if feasible, or if termination is not feasible, report the problem to the Secretary of Health and Human Services.

(r) To the extent that Business Associate is to carry out Covered Entity's obligations under the Privacy Rule or the Security Rule, Business Associate will comply with any Privacy or Security Rule requirements that apply to Covered Entity in its performance of the obligation.

### 3. Permitted Uses and Disclosures of Protected Health Information by Business Associate

(a) General Use and Disclosure Provisions.  Except as otherwise limited in this BA Agreement, Business Associate may use or disclose Protected Health Information obtained from or on behalf of Covered Entity to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in this BA Agreement, provided that such use or disclosure complies with HIPAA. Business Associate acknowledges and agrees that it acquires no title or rights to the Protected Health Information, including any de-identified information, as a result of this BA Agreement.

(b) Specific Use and Disclosure Provisions.

(i) Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity and fulfill its obligations under any underlying agreement with Covered Entity, provided that such use or disclosure would not violate the Privacy Rule or Security Rule if done by the Covered Entity.

(ii) Business Associate may use and disclose Protected Health Information for the proper and necessary management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that, as to any such disclosure:

(A) the disclosure is Required By Law; or

(B) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies Business Associate of any confidentiality breaches.

(iii) Except as otherwise limited in this BA Agreement, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity, relating to the health care operations of Covered Entity.

5

13563529.1

**Exhibit A, Page 98**

**4. Survival and Termination**

(a) Survival. Business Associate's obligations under this BA Agreement shall survive the termination of this BA Agreement and shall end when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity. If it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b) Termination for Cause. Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity shall provide written notice to Business Associate and may terminate this BA Agreement and any underlying agreement with Business Associate if Business Associate does not cure the breach or end the violation within 30 days of such notice.

(c) Effect of Termination

(i) Except as provided below in paragraph 4(c)(ii) of this BA Agreement, upon termination of this Agreement, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(ii) In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity written notification of the conditions that make return or destruction infeasible, and, if Covered Entity determines that return or destruction is infeasible, Business Associate shall extend the protections of this BA Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information. If it is infeasible for Business Associate to obtain, from a subcontractor or agent, any Protected Health Information in the possession of the subcontractor or agent, Business Associate must provide a written explanation to Covered Entity and require the subcontractors and agents to agree in writing to extend any and all protections, limitations and restrictions contained in this BA Agreement to the subcontractors' and/or agents' use and/or disclosure of any Protected Health Information retained after the termination of this BA Agreement, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the Protected Health Information infeasible.

6

13563529.1

### 5. Interpretation and Amendment of this BA Agreement

To the degree the terms of this BA Agreement conflict with the terms of any underlying contract, the terms of this BA Agreement shall control. A reference in this BA Agreement to a section of the Privacy Rule means the section as in effect or as amended. Any ambiguity or inconsistency in this BA Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy Rule, the Security Rule, and the HITECH Act. The parties hereto agree to negotiate in good faith to amend this BA Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule, and HIPAA, and for Business Associate to provide services to Covered Entity. However, no change, amendment, or modification of this BA Agreement shall be valid unless it is set forth in writing and agreed to by both parties.

### 6. No Third Party Rights/Independent Contractors

The parties to this BA Agreement do not intend to create any rights in any third parties other than the parties. No patient whose confidential medical records may have been subject to an unintended disclosure of breach by any party shall have any rights or remedies under this BA Agreement. The parties agree that they are independent contractors and not agents of each other.

### 7. Notices

Any notice required or permitted by this BA Agreement to be given or delivered shall be in writing and shall be deemed given or delivered if delivered in person, or sent by courier or expedited delivery service, or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile (if confirmed). Each party may change its address for purposes of this BA Agreement by written notice to the other party.

    WHEREFORE, the parties have executed this BA Agreement, effective as of the last signature date below.

Covered Entity:  Sonoma West Medical Center

Signature: _____       Date: _____
Printed Name: _____
Title: _____

Business Associate:  Reliance Laboratory Testing, Inc.


Signature: _____       Date: _____
Printed Name: _____
Title: _____

7

13563529.1

**Exhibit A, Page 100**

# EXHIBIT B

REDACTED

**MRN:** ███████
**Dob:** ████████   **Age:** ██ **Gender:** ██
**Address:** (Not Provided)
**Phone:** (Not Provided)
**Primary Doctor:** Ryan Peterson
**Medicare:** (Not Provided) **Medicaid:** (Not Provided)

**Accn ID:** ███████

**Requisition ID:** N/A
**Draw Date & Time:** 9/29/2017 17:20
**Receive Date & Time:** 9/30/2017 10:30
**Orders:** TOX-DRUG
**Draw by:** PT
**Draw location:** (Not Provided)
**Fasting:** N
**Ordering Doctor:** Ryan Peterson
**Ordering Client** (Not Provided)
**Report:** TOX **Status:** Final

**Exhibit B, Page 101**

**Letter of Medical Necessity: Urine, Blood, & Pharmacogenomics Testing**

Date of Service: __9/29/2017__

Patient Name: _____ <span style="color:red">REDACTED</span> _____

Patient Date of Birth: _____

CD-10 Diagnosis Codes: ___F19.20, F10.20___

Dear Claims Specialist:

Please consider this Letter of Medical Necessity a formal request for full coverage of the __URINE__ testing services that I intend to prescribe for your subscriber (Patient Name Listed above). __URINE__ testing laboratory services will be performed only by a CLIA-certified laboratory, and the results will assist in patient-specific clinical decisions regarding the medical management of your subscriber.

In order to provide the safest, most effective and affordable medical care possible, the requested __URINE__ testing is medically necessary for my patient for several reasons. The primary reason(s) for my request apply specifically to the patient listed above:

___Determine Drug-Gene interactions, better predicting how the patient will metabolize medications
___Determine Drug-Drug interactions based on the patient's genetic-determined phenotype
___Reduce the number of medications that my patient is currently taking
___Determine the potential effectiveness of medications prescribed to my patient
_X_Determine the best course of therapy/treatment for my patient
___Acquire specific dosing recommendations to avoid toxicity and adverse drug reactions (ADR's)
___Patient has a family history of thrombosis
___Patient is not responding to the drugs he/she has been prescribed
___Patient has suffered recent or previous Severe Adverse Drug Reactions (SADR)
___Verify Compliance with treatment: (synopsis of treatment plan)_____
_X_Identify undisclosed drug use or abuse
___Evaluate aberrant behavior (Explain):_____
___Other (please specify):_____

The FDA recommendations for genetic testing is currently listed on the labels of over 150 prescription medications. Please visit (http://www.fda.gov/drugs/scienceresearch/researchareas/pharmacogenetics/ucm083378.htm) for more information. Recommendations typically include pharmacologic treatment contraindications and dose-selection strategies based on patient genetic status.

The American College of Physicians (ACP, 2008), states Urine Drug Testing (UDT) is common and serves purposes such as enhancing patient care, providing objective documentation of an individual's compliance with the treatment plan and opioid agreement, reducing the risk of an unrecognized drug misuse/abuse problem, and proving or disproving abuse/addiction of illicit or non-prescribed licit drugs. Please visit ( https://www.acponline.org/ ) for more information.

Best regards,

Name of Practice_____Valley Restoration Center_____

Ordering Clinician Signature:___*signature*___ Date 9/29/2017
(MD/DO, Clinical Nurse Specialist, Nurse-Midwives, Nurse Practitioner, Physician Assistant, Genetic Counselor*)

* Clinician prescribing requirements vary by state

**Exhibit B, Page 102**

# Sonoma West Medical Center

501 Petaluma Ave.
Sebastopol, CA 95472
PH: (707) 823-8511 FAX: (707) 829-4312
Medical Director: Steve Mertens, M.D.

## REDACTED

| PATIENT: ███████ | DOCTOR: Peterson, Ryan | | LOCATION: | |
|---|---|---|---|---|
| MED. RECORD #: ██████ SEX: ● AGE: ● DOB: ██████ | | | OTHER ID: | |
| Accn #: ████ Drawn: 9/29/17 17:20 Recv'd: 9/30/17 10:30 | | Printed: 12/02/17 8:29 | **FINAL** | |

| Test | Normal | Abnormal | Cutoff | Units |
|---|---|---|---|---|
| **Preliminary Drug Screen** | | | | |
| AMPH | NEGATIVE | | 500 | ng/mL |
| 6-ACETYLMORPH | NEGATIVE | | 10.0 | ng/ml |
| BARBITURATES | NEGATIVE | | 200 | ng/mL |
| BENZODIAZ | NEGATIVE | | 200 | ng/mL |
| COCAINE | NEGATIVE | | 150 | ng/mL |
| BUPRENORPHINE | NEGATIVE | | 5.0 | ng/mL |
| EDDP | NEGATIVE | | 100 | ng/mL |
| ETHYL GLUCUR. | NEGATIVE | | 500 | ng/mL |
| METHAMPH | NEGATIVE | | 500 | ng/mL |
| OPIATES | NEGATIVE | | 300 | ng/mL |
| OXYCODONE | NEGATIVE | | 100 | ng/mL |
| PCP | NEGATIVE | | 25.0 | ng/mL |
| THC | NEGATIVE | | 50.0 | ng/mL |

* The development and performance characteristics of these tests were
determined by the laboratory and have not been cleared or approved by
the FDA.

Tech:_____

**Exhibit B, Page 103**